**FLORIDA GULF COAST BUILDING AND CONSTRUCTION TRADES COUNCIL, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 85–3172.

United States Court of Appeals, Eleventh Circuit.

Aug. 11, 1986.

Richard M. Resnick, David M. Silberman, Laurence Gold, Washington, D.C., Mark F. Kelly, Tampa, Fla., for petitioner, cross-respondent.

Elliott Moore, Deputy Asst. Gen. Counsel, N.L.R.B., Kenneth Hipp, Peter Winkler, Washington, D.C., for respondent, cross-petitioner.

W. Reynolds Allen, Mark E. Levitt, Tampa, Fla., for intervenor Edward J. DeBartolo Corp.

Lawrence M. Cohen, Fox & Grove, Chartered, Martin K. Denis, Chicago, Ill., for amicus curiae Chamber of Commerce.

Before HILL and ANDERSON *, Circuit Judges, and TUTTLE, Senior Circuit Judge.

* Judge Anderson was a member of the panel, but took no part in the consideration or decision of

CORRECTED OPINION

PER CURIAM:

In this case we must determine whether a union violates § 8(b)(4)(ii)(B) of the National Labor Relations Act when it distributes handbills urging a consumer boycott of all the tenants of a mall in furtherance of its dispute with a company constructing a building for one tenant of the mall.

## I.

The facts of the case are undisputed and are detailed in the opinion of the Supreme Court in *DeBartolo Corp. v. NLRB*, 463 U.S. 147, 103 S.Ct. 2926, 77 L.Ed.2d 535 (1983) (*"DeBartolo I"*). Briefly summarized, the facts reflect the following. DeBartolo owns a large shopping mall in Tampa, Florida. Approximately 85 retail establishments are tenants of the mall. One of the mall's tenants, H.J. Wilson Company, Inc. ("Wilson's") contracted with High Construction Company ("High") to build a store for Wilson's at the mall. Florida Gulf Coast Building Trades Council, AFL–CIO (the "Union"), became involved in a primary labor dispute with High over the payment of allegedly substandard wages and benefits. The Union distributed handbills at the entrances to the mall urging that consumers not patronize tenants of the mall.

DeBartolo filed an unfair labor practice charge alleging that the Union was engaging in a secondary boycott in violation of the National Labor Relations Act, as amended ("NLRA" or the "Act"), 29 U.S.C. § 151 *et seq.* In February 1980, the general counsel of the National Labor Relations Board ("NLRB" or the "Board") issued a complaint against the Union alleging a violation of § 8(b)(4)(ii)(B) of the Act.[1] Without deciding whether the distribution of the handbills violated the statute, the Board concluded that the handbilling was not prohibited by the Act because of the "publicity proviso"[2] and dismissed the complaint. *Florida Gulf Coast Buildings Trade Council, AFL–CIO (Edward J. DeBartolo Corp.)*, 252 N.L.R.B. 702 (1980). The U.S. Court of Appeals for the Fourth Circuit affirmed. *DeBartolo v. NLRB*, 662 F.2d 264 (4th Cir.1981). In *DeBartolo I*, the Supreme Court reversed the decision of the Fourth Circuit and held that the Union's conduct fell outside the protection of the publicity proviso contained in § 8(b)(4). 463 U.S. at 157, 103 S.Ct. at 2932. The Court did not determine whether the distribution of the handbills violated the underlying restrictions of the NLRA or, if so pro-

---

this case. This case is being decided by a quorum. 28 U.S.C. 46(d).

**1.** The statute reads in relevant part:
(b) It shall be an unfair labor practice for a labor organization or its agents—
 . . . .
 (4) . . .
 (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
 . . . .
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as a representative of his employees unless such labor organization has been certified as the representative of such employees under the provision of § 159 of this title: *Provided,* That nothing contained in this clause (B) shall

be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
29 U.S.C. § 158(b)(4)(ii)(B).

**2.** The proviso reads as follows:
*Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.
29 U.S.C. § 158(b)(4).

hibited, whether the NLRA is constitutional under the First Amendment.

On remand, the NLRB issued the supplemental decision and order which are the subject of the instant case. The Board found that:

By distributing handbills urging potential customers not to shop at East Lake Square Mall, the [Union] has coerced the mall tenants with an object of forcing the mall tenants to cease doing business with DeBartolo in order to force DeBartolo and/or Wilson's to cease doing business with High, thereby violating Section 8(b)(4)(ii)(B) of the Act.

Record on Appeal at 237. The Board did not consider whether its interpretation of the Act would violate the First Amendment, presuming, "as a Congressionally created administrative agency[,] ... the constitutionality of the Act we administer." *Id.* at 236. The Board issued an order instructing the Union to cease and desist from the distribution of handbills and requiring the Union to post an appropriate notice. The Union petitions this court to set aside the decision and order of the NLRB. The NLRB presents a cross-petition for enforcement of its order. Because we find that the Union's handbilling activities do not violate § 8(b)(4)(ii)(B) of the NLRA, we grant the Union's petition and deny enforcement of the order.

## II.

The Supreme Court recognized that "this case arises out of an entirely peaceful and orderly distribution of a written message, rather than picketing." [3] *DeBartolo I,* 463 U.S. at 157, 103 S.Ct. at 2933. The Union contends that such distribution of a written message is a form of speech protected by the First Amendment. If § 8(b)(4)(ii)(B) is interpreted to restrict the distribution of handbills, then, the Union argues, the NLRA violates the First Amendment. Neither the courts nor the NLRB has directly

considered the constitutionality of restricting nonpicketing union publicity. *Cf. Hospital & Service Employees Union v. NLRB (Delta Air Lines),* 743 F.2d 1417, 1428 (9th Cir.1984). If we were to conclude that the statutory provision in question makes it unlawful for unions to distribute such handbills to the public, we would be required to consider whether this provision is consistent with the First Amendment. However, the statutory question presented is almost as novel as the constitutional question. Neither the Supreme Court nor the court of appeals for any circuit has decided whether the statutory prohibition against threatening, coercing or restraining applies to the distribution of handbills.

The Supreme Court has held "that an Act of Congress not be construed to violate the Constitution if any other possible construction remains available." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979); *accord DeBartolo I,* 463 U.S. at 157 n. 10, 103 S.Ct. at 2933 n. 10 ("when Congress legislates in a fashion that restricts communicative activity, it expects the statutory language to be construed narrowly"); *International Association of Machinists v. Street,* 367 U.S. 740, 790, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961) ("Federal statutes are to be construed as to avoid serious doubt of their constitutionality."). "Moreover, the Court has followed this policy in the interpretation of the [NLRA] and related statutes." *Catholic Bishop,* 440 U.S. at 500, 99 S.Ct. at 1318. In *Catholic Bishop,* the Court stated that it would determine whether the statutory interpretation proposed by the NLRB "would give rise to serious constitutional questions." *Id.* at 501, 99 S.Ct. at 1319. If so, the Court held that " 'the affirmative intention of the Congress clearly expressed,' " *id.* at 501, 99 S.Ct. at 1319 (quoting *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147,

---

**3.** This appears to be the correct interpretation of the language of the Court:

Stressing the *fact* that the case arises out of an entirely peaceful and orderly distribution of a written message, rather than picketing, the

Union argues that its handbilling is a form of speech protected by the First Amendment. 463 U.S. at 157, 103 S.Ct. at 2933 (emphasis added).

77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)), must be identified, before the statute could be construed in such a manner.

Thus, we must consider whether the statutory interpretation suggested by the Board would cause serious doubts about the constitutionality of § 8(b)(4). If we determine that there would be serious constitutional questions, we must examine the statute and its legislative history to identify "the affirmative intention of the Congress clearly expressed" to restrict such handbilling.

### III.

■ In *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), the Supreme Court considered the validity of an injunction against distribution of leaflets which were alleged to be intended to coerce and intimidate an individual. The individual was a real estate broker who was alleged to have engaged in tactics termed "panic peddling" and "block busting." A community organization asked the broker to sign an agreement that he would not solicit real estate business in their community. When the broker refused to sign the agreement, the organization distributed leaflets near his home which were critical of his business and which were designed to cause him to sign the agreement with them. An injunction prohibiting the organization from distributing the leaflets was affirmed by a state appellate court on the ground that the alleged activities were coercive and intimidating, rather than informative, and were therefore not entitled to First Amendment protection. *Id.* at 418, 91 S.Ct. at 1577. The Supreme Court reversed, explaining:

> This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected by the First Amendment.... The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not funda-

mentally different from the function of a newspaper.... [S]o long as the means are peaceful, the communication need not meet standards of acceptability.

*Id.* at 419, 91 S.Ct. at 1577–78. Thus, the distribution of handbills is generally fully protected by the First Amendment, even when designed to pressure others to act.

In *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), the Court, quoting at length from *Organization for a Better Austin,* held that the First Amendment protects a secondary boycott organized by a civil rights group. The Court stated: "Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action." 458 U.S. at 910, 102 S.Ct. at 3424. " ' "Free trade in ideas" means free trade in the opportunity to persuade to action, not merely to describe facts.' " *Id.* (quoting *Thomas v. Collins,* 323 U.S. 516, 537, 65 S.Ct. 315, 325, 89 L.Ed. 430 (1945)).

However, in *Claiborne Hardware,* the Court "recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." *Id.* at 912, 102 S.Ct. at 3425. The Court gave the following as an example:

> Unfair trade practices may be restricted. Secondary boycotts and picketing by labor unions may be prohibited, as part of "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife."

*Id.* (quoting *NLRB v. Retail Store Employees Union, Local 1001 (Safeco),* 447 U.S. 607, 617–18, 100 S.Ct. 2372, 2378, 65 L.Ed.2d 377 (Blackmun, J., concurring in part)).

■ The discussion of restrictions on secondary picketing in *Claiborne Hardware* reflects the settled principle that labor picketing is entitled to less First Amendment protection than pure speech.

Such treatment is based on the concept that picketing includes elements in addition to speech. These additional elements justify restrictions on picketing which would not be permitted vis-a-vis pure speech:

> [W]hile picketing is a mode of communication it is inseparably something more and different. Industrial picketing "is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." [*Bakery & Pastry Drivers & Helpers Local v. Wohl*, 315 U.S. 769, 775, 776 [62 S.Ct. 816, 819, 86 L.Ed. 1178] (Douglas, J., concurring)].... Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word....
>
> ....
>
> A State may constitutionally permit picketing despite the ingredients in it that differentiate it from speech in its

ordinary context.... And we have found that because of its element of communication picketing under some circumstances finds sanction in the Fourteenth Amendment.... However general or loose the language of opinions, the specific situations have controlled decision. It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent.

*Hughes v. Superior Court*, 339 U.S. 460, 464–65, 70 S.Ct. 718, 720–21, 94 L.Ed. 985 (1950). *See also Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 311 n. 17, 99 S.Ct. 2301, 2315 n. 17, 60 L.Ed.2d 895 (1979);[4] *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760 (Tree Fruits)*, 377 U.S. 58, 77, 84 S.Ct. 1063, 1073, 12 L.Ed.2d 129 (1964) (Black, J., concurring);[5] *International Board of Teamsters, Local 695 v. Vogt*, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957). In *Safeco*, Justice Stevens reemphasized that picketing has a non-speech element the regulation of which may justify incidental restrictions of its speech element:

> I have little difficulty in concluding that the restriction at issue in this case is constitutional. Like so many other kinds

**4.** The Supreme Court noted that although secondary picketing against a neutral employer could be constitutionally prohibited, picketing was *different from other manners of expression* for constitutional purposes:

> Although we have previously concluded that picketing aimed at discouraging trade across the board with a truly neutral employer may be barred compatibly with the Constitution, ... we have noted that, for First Amendment purposes, picketing is qualitatively "different from other modes of communication."

*Babbitt*, 442 U.S. at 311 n. 17, 99 S.Ct. at 2315 n. 17 (citations omitted).

**5.** Justice Black stated:

> "Picketing," in common parlance and § 8(b)(4)(ii)(B), includes at least two concepts: (1) patrolling, that is standing or marching back and forth or round and round on the street, sidewalks, private property, or elsewhere, generally adjacent to someone else's premises; (2) speech, that is arguments, usually on a placard, made to persuade other

people to take the picketers' side of a controversy.... While "the dissemination of information concerning the facts of the labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution," *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093, patrolling is, of course, conduct, not speech, and therefore is not directly protected by the First Amendment. It is because picketing includes patrolling that neither *Thornhill* nor cases that followed it lend "support to the contention that peaceful picketing is beyond legislative control." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 499–500, 69 S.Ct. 684, 690, 689, 93 L.Ed. 834. ... However, when conduct not constitutionally protected, like patrolling, is intertwined as in picketing, with constitutionally protected free speech and press, regulation of the non-protected conduct may at the same time encroach on freedom of speech and press.

*Tree Fruits*, 377 U.S. at 77, 84 S.Ct. at 1073–74 (Black, J., concurring).

of expression, picketing is a mixture of conduct and communication. In the labor context, it is the conduct element rather than the particular idea being expressed that often provides the most persuasive deterrent to third persons about to enter a business establishment. In his concurring opinion in *Bakery Drivers v. Wohl*, 315 U.S. 769, 776–77, 62 S.Ct. 816, 819–20, 86 L.Ed. 1178, Mr. Justice Douglas stated:

"Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation."

Indeed, no doubt the principal reason why handbills containing the same message are so much less effective than labor picketing is that the former depend entirely on the persuasive force of the idea.

The statutory ban in this case affects only that aspect of the union's efforts to communicate its views that calls for an automatic response to a signal rather than a reasoned response to an idea. *Safeco*, 447 U.S. at 618–19, 100 S.Ct. at 2379–80 (Stevens, J., concurring in part).

The handbilling in the instant case was peaceful and orderly. It involved none of the non-speech elements, *e.g.*, patrolling, which justify restrictions on picketing.[6] In attempting to enlist the aid of consumers in its dispute with the construction company, the Union was relying "entirely on the persuasive force of the idea." *Id.* at 619, 100 S.Ct. at 2380. The handbills left the recipients completely free to act in agreement with the ideas presented or to refuse to do so.

In the labor context, the Supreme Court has also held that communication which is merely a "threat of retaliation based on misrepresentation and coercion," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), is "without the protection of the First Amendment." *Id.* See also *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469, 477, 62 S.Ct. 344, 348, 86 L.Ed. 348 (1941). In those cases, the Supreme Court held that communications which contained a "threat of reprisal or force or promise of

6. The NLRB suggests that handbilling like picketing involves conduct in addition to speech, i.e., the "physical pressure" of the person distributing the handbills or pamphlets. In making this argument, the NLRB quoted the case of *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), *overruled on other grounds, Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). However, the NLRB misquoted *Logan Valley Plaza* in its brief. In *Logan Valley*, the Supreme Court stated that handbilling involves conduct other than speech "namely, the physical *presence* of the person distributing the leaflets." *Id.* at 316, 88 S.Ct. at 1607 (emphasis added). On the facts of *Logan Valley*, the Supreme Court was necessarily concerned with "presence"; nowhere did it address "pressure" applied by those distributing handbills.

The physical presence of people distributing handbills was relevant in *Logan Valley*, a case involving picketing in a shopping center, because in earlier cases the Court had found "that title to municipal property [was], standing alone, an insufficient basis for prohibiting all [physical presence on] such property for the purpose of distributing printed matter." *Logan Valley*, 391 U.S. at 316, 88 S.Ct. at 1607. From this rationale, which had been developed in handbilling cases, the Court reasoned that title to property was also insufficient reason to ban people carrying informational picket signs. *Id.* Fully protected speech usually involves the physical presence of the speaker and reasonable content-neutral time, place, or manner restrictions may be placed on fully protected speech because of, among other reasons, the physical presence of the speaker or those listening to him. *See, e.g., Schneider v. State of New Jersey*, 308 U.S. 147, 160–61, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939) ("[A] person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic.").

In this case, there is no indication in the record that the people distributing the handbills outside the mall were pressuring or harassing the consumers entering the mall. Thus, we are not faced with the situation where the distribution of handbills took on some of the aspects of picketing.

benefit" are not entitled to First Amendment protection.

■■■ In the instant case, the NLRB held that the Union, by urging consumers to avoid patronizing the mall tenants, hoped to coerce the mall tenants to pressure Wilson's and/or DeBartolo to force High, with whom the Union has a primary dispute, to use Union standards. However, a finding of statutory coercion would not control the First Amendment analysis. While the focus of § 8(b)(4)(ii)(B) is coercion of the secondary employer, the secondary employer vis-a-vis the handbill is a non-listener. The handbills in this case lacked any elements which could threaten, coerce or restrain the listeners, i.e., the consumers. As pointed out in *Gissel Packing* and *Virginia Electric & Power*, for purposes of assessing the First Amendment protection to which communication is entitled, a court must focus on the possible coercion of the listeners, in this case, the consumers. Moreover, as the Supreme Court stated in *Organization for a Better Austin v. Keefe* and *NAACP v. Claiborne Hardware Co.*, the claim that speech is intended to exercise an ultimate coercive impact upon someone does not remove that speech from the reach of the First Amendment. *Claiborne Hardware*, 458 U.S. at 911, 102 S.Ct. at 3424; *Organization for a Better Austin*, 402 U.S. at 419, 91 S.Ct. at 1577.

In addition, it should be pointed out that the Union was not seeking to have the consumers, the mall tenants, or DeBartolo and/or Wilson's do anything which would be illegal. The consumers were legally free to agree with the Union's position and decline to patronize the mall tenants. The mall tenants would have been acting equally legally if, in response to the consumer pressure, they requested that DeBartolo and/or Wilson's request that High use union labor. In the same way, Wilson's and/or DeBartolo would have been within the law if they requested High to accede to the Union's demands regarding terms and conditions of employment.

■■■ In light of the absence of the non-speech elements which have permitted restrictions on labor picketing and in light of the full First Amendment protection afforded to handbilling and pamphleteering, we conclude that if § 8(b)(4)(ii)(B) is construed to prohibit certain types of handbilling, serious constitutional questions will arise.[7] Therefore, we must examine the

---

7. If the statute is read to prohibit handbilling, that prohibition would clearly be content-based. The prohibition is addressed specifically to handbilling that is threatening, coercive, or restraining. When the government regulates an expression of a particular message, without regard to whether the expression consists of speech or speech plus conduct, it has legislated on the basis of content. In order to regulate speech on the basis of content, it is normally necessary for the government to prove a compelling state interest and for the government to show that the statute was narrowly drawn to achieve that end. *See, e.g., United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); *Perry Education Association v. Perry Local Educators Association,* 460 U.S. 37, 55, 103 S.Ct. 948, 960, 74 L.Ed.2d 794 (1983); *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980); *First National Bank v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). It has been suggested that § 8(b)(4)(ii)(B) "cannot meet the exacting scrutiny of the compelling interest standard." Goldman, *The First Amendment and Nonpicketing Labor Publicity Under Section 8(b)(4)(ii)(B) of the National Labor Relations Act,* 36 Vand.L.Rev. 1469, 1505 (1983); *accord* Comment, *"It Takes More Than Money to Fly Delta. It Takes Nerve.": Union's Secondary Boycott Publicity and the First Amendment: Delta Air Lines,* 67 Minn.L.Rev. 1235, 1271 (1983).

The NLRB suggests that speech which urges consumers to engage in a secondary boycott is commercial speech which can be and has been restricted in response to a substantial governmental interest.

Whether the Union's handbills constitute commercial speech or should be treated as commercial speech is a difficult question which would by no means be as easily resolved as the NLRB suggests. It is not clear that the handbills involved in the instant case are commercial speech or should be treated as commercial speech. It would seem that a strong argument could be made that the Union in the instant case was expressing social and moral values, as well as economic considerations in its written message. Moreover, the definition of commercial speech is not clear. In *Central Hudson Gas & Electric,* the Supreme Court described commercial speech as "expression related solely to the economic interest of the speaker and his audience" and also as "speech proposing a commercial transaction." *Id.* at 561–62, 100 S.Ct. at

statute and its legislative history in order to identify "the affirmative intention of the Congress clearly expressed" to prohibit such speech.

## IV.

The language of the statute contains no clear expression of an affirmative intent of Congress to prohibit the distribution of handbills urging a secondary boycott. It is true, however, that the prohibition against threatening, coercing, or restraining could be read very broadly. Therefore, we must examine the legislative history of this portion of the NLRA to determine whether Congress intended to proscribe such publicity.[8]

Congress originally made secondary boycotts an unfair labor practice in 1947 under the Taft-Hartley Act. Section 8(b)(4), as in effect from 1947 to 1959, prohibited unions from inducing a strike where the object of the strike was compelling an employer to cease doing business with any other per-

son.[9] There were three major loopholes in the Taft-Hartley language:

Since only inducement of "employees" was proscribed, direct inducement of a supervisor or the secondary employer by threats of labor trouble was not prohibited. Since only a "strike or a concerted refusal" was prohibited, pressure upon a single employee was not forbidden. Finally, railroads, and municipalities were not "employers" under the Act and therefore an inducement or encouragement of their employees was not unlawful.

*Tree Fruits*, 377 U.S. at 64–65, 84 S.Ct. at 1067–68.

During both the Eighty-fifth Congress and the Eighty-sixth Congress, the Senate passed labor reform bills—the Kennedy-Ives bill during the Eighty-fifth Congress and the Kennedy-Ervin bill during the Eighty-sixth Congress—neither of which included any amendments to § 8(b)(4). *Id.* at 65, 84 S.Ct. at 1067. Several amendments proposed to fill the three major gaps

2349. Justice Stevens, concurring in *Central Hudson Gas & Electric,* suggested that the former definition of commercial speech was too broad. He thought that such a definition might encompass speech such as that made by an economist or by a *labor leader.* Thus, the Court's definition of commercial speech might be broad enough to encompass labor speech, although the Court has yet to include economic or labor speech in that category. *Id.* at 579–80, 100 S.Ct. at 2358 (Stevens, J., concurring). Previously, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), in which the Supreme Court for the first time extended First Amendment protection to commercial speech, the Court compared labor speech and commercial speech and found "no satisfactory distinction between the two kinds of speech." *Id.* at 763, 96 S.Ct. at 1826. However, in making this point, the Court cited *Gissel Packing Co.* and *Virginia Electric & Power Co.,* cases where an employer's communications contained threats and coercion of the listeners, not information. Thus, labor speech which does not amount to threats or coercion may not be considered the equivalent of commercial speech and may be entitled to full First Amendment protection.

Given our disposition of the statutory issue, we need not address whether the Union's handbills constitute commercial speech or whether the handbills should be treated like commercial

speech, or, if the handbills should be treated like commercial speech, whether there is a substantial government interest which the statute directly advances in a manner "not more extensive than is necessary to serve that interest." *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). It has been suggested that nonpicketing labor publicity is not commercial speech and should not be treated like commercial speech because it satisfies the values underlying the First Amendment. Goldman, *supra,* at 1490.

8. The Union does not challenge the findings that the mall tenants were secondary parties and that the object of the handbilling was a boycott of the mall tenants. Their statutory argument is that when Congress enacted a prohibition on threatening, coercing, or restraining, it did not intend to prohibit handbilling.

9. The history of the 1959 Amendments to the NLRA has been discussed at length in several cases. *See, e.g., Tree Fruits,* 377 U.S. at 62–71, 84 S.Ct. at 1065–71; *NLRB v. Servette, Inc.,* 377 U.S. 46, 51–55, 84 S.Ct. 1098, 1102–04, 12 L.Ed.2d 121 (1964). While our discussion of the legislative history repeats much of what has been set out in earlier cases, we must reexamine the whole legislative history focusing for the first time on whether Congress intended to proscribe nonpicketing labor publicity.

in the Taft-Hartley Act were rejected by the Senate.

During the Eighty-sixth Congress, the Eisenhower Administration did introduce a bill to close the three loopholes. In a message to Congress, "Transmitting a 20-point Program to Eliminate Abuses and Improper Practices in Labor-Management Relations," President Eisenhower proposed to

> amend the secondary boycott provisions of the [NLRA] so as to cover the direct coercion of employers to cease or agree to cease doing business with other persons; union pressures directed against secondary employers not otherwise subject to the act; and inducements of individual employees to refuse to perform services with the object of forcing their employers to stop doing business with others; and to make clear that secondary activities permitted against an employer performing "farmed-out struck work" and, under certain circumstances, against secondary employers engaged in work at a common construction site with the primary employer.

S.Doc. No. 10, 86th Cong., 1st Sess. 3 (1959), *reprinted in* 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 82 (1959) [hereinafter cited as "Leg.Hist."]. The Administration bill, S. 748, was the first Senate bill to propose making it an unfair labor practice to "threaten, coerce or restrain" a secondary employer. In *Tree Fruits*, the Supreme Court noted that in testifying in support of the Administration's bill, the Secretary of Labor did not refer to consumer picketing as making the amendments necessary. *Tree Fruits*, 377 U.S. at 65, 84 S.Ct. at 1067. It is additionally clear that the Secretary did not refer to publicity directed at consumers as making amendments to § 8(b)(4) necessary. 105 Cong. Rec. 1567–68 (1959), *reprinted in* 2 Leg. Hist. at 993–94. Moreover, the Supreme Court found that Senator Goldwater, "an insistent proponent of stiff boycott curbs," who proposed his own amendments to close the loopholes, did not refer to consumer picketing, much less publicity directed at consumers, as making necessary the amendments which he and the Administration proposed. *Tree Fruits*, 377 U.S. at 65, 84 S.Ct. at 1067; *see* 105 Cong.Rec. 1163 and 5764 (1959), *reprinted in* 2 Leg.Hist. at 979 and 1079.[10]

■ When the Senate Committee on Labor and Public Welfare reported out the Kennedy-Ervin Bill, S. 1555, without any proposal to amend § 8(b)(4), the proponents of such a change again listed the major loopholes which they felt needed to be closed in the prohibition against secondary boycotts. S.Rep. No. 187 on S. 1555, 86th Cong., 1st Sess. 70 (1959), *reprinted in* 1 Leg.Hist. at 475, U.S.Code Cong. & Admin. News 1959, p. 2318. Their report mentioned the problem with railroad and government employees, the inducement of individual employees, and hot-cargo clauses.[11] It also focused on "coercion of employers." The report pointed out that there was a problem with a union threatening a secondary employer "with a strike or picket line if he continues to do business with [the primary] employer." *Id.* It stated that the Administration bill, S. 748, solved the "coercion of employers" problem by amending § 8(b)(4) to make the restriction apply to "'threatern [sic], coerce, or restrain any person engaged in commerce ...' as well as 'induce or encourage any individual employed by any person.'" *Id.*[12] The Administration bill also dealt with the other three loopholes discussed. Thus, it is evident that the proponents of the amend-

---

10. The Supreme Court noted that Senator Goldwater did refer to consumer picketing when the bill agreed upon by the House-Senate conference committee was before the Senate. *Tree Fruits*, 377 U.S. at 65 n. 10, 84 S.Ct. at 1067 n. 10. His statements in support of the conference bill are discussed *infra*.

11. "Hot-cargo" clauses are clauses in union contracts whereby the employer agrees not to handle products which the union has "blacklisted."

12. The report pointed out that Senator McClellan had introduced two bills, S. 1384 and S. 1385, which also dealt with these loopholes. S.Rep. No. 187 on S. 1555, 86th Cong., 1st Sess. 70, *reprinted in* 1 Leg.Hist. at 475.

ments to § 8(b)(4) had in mind non-consumer picketing and more direct economic actions, *e.g.*, strikes, when they proposed to amend that section by making its restriction apply to "threaten, coerce, or restrain." There is no indication that they intended to restrict distribution of publicity to consumers.

When the Kennedy-Ervin Bill was being debated by the full Senate, Senator McClellan, who had offered his own bills which included amendments to § 8(b)(4), proposed an amendment to make it unlawful to "exert, or attempt to exert any economic or other coercion against, or offer any inducement to, any [secondary] person engaged in commerce...." 105 Cong.Rec. 5970 (1959), *reprinted in* 2 Leg.Hist. at 1193. Senator McClellan stated that the amendment would close the three loopholes discussed above and would also apply to secondary consumer picketing:

> The amendment, Mr. President, covers pressure in the form of dissuading customers from dealing with secondary employers. *That refers to establishing a picket line around a merchant's store,* when the merchant handles the product of a company or of a manufacturing plant in which there is a strike. In other words, that is a form of coercion against an innocent employer, in an effort to compel the employer who has a strike on his hands to come to terms with the union. It is an effort to influence the original employer.
>
> ....
>
> I point out that we have cases of merchants who for 20 years, 10 years, or for a long period of time, may have been handling a particular brand or product. A merchant may have built his business around the product.... The merchant may have a competitor who is handling a competitive product made by another manufacturer, which serves the same function, but which is a different brand and is manufactured by someone else.

In one of these plants there may be a strike, and the union may picket the merchant who is handling the product of the struck plant. The union may say to the merchant, "You cannot sell this product. If you do, we will picket your place of business. Thus you will not be able to get your supplies, because the Teamsters will not cross the picketline."

> In addition, the merchant's customers would be embarassed. They would be harassed. They would see the picket sign. What would the picket sign say? It would say "Unfair to labor." How is the merchant unfair to labor? It is simply a case of the merchant not being willing to stop handling a product which he has been handling for 20 years and on which he has built his business. That is a secondary boycott which, it seems to me, ought to be prohibited.

105 Cong.Rec. 5971 (1959), *reprinted in* 2 Leg.Hist. at 1194 (emphasis added).[13] It is clear from this statement that Senator McClellan intended only to prohibit picketing of the secondary merchant. Prior to his proposals regarding consumer picketing, the proponents of the Administration bill had not discussed any form of restriction on appeals to consumers. *See Tree Fruits,* 377 U.S. at 65–67, 84 S.Ct. at 1067–68.

As was pointed out in *Tree Fruits,* the proposed House legislation "[f]rom the outset ... included provisions concerning secondary boycotts." *Id.* at 67, 84 S.Ct. at 1068. "The Landrum-Griffin bill, which was ultimately passed by the House, embodied the Eisenhower Administration's proposals as to secondary boycotts. The initial statement of Congressman Griffin in introducing the bill which bears his name, contains no reference to consumer picketing in the list of abuses which he thought required the secondary boycotts amendments." *Id.* at 67, 84 S.Ct. at 1068–69 (footnotes omitted). Thus, while the proponents of the House bill wanted, from the

---

**13.** Senator McClellan's amendment was rejected. 105 Cong.Rec. 5975 (1959), *reprinted in* 2 Leg.Hist. at 1198.

beginning of debate, to amend § 8(b)(4) to close the major loopholes, there is no indication that *consumer* picketing or publicity was initially considered a problem.

On August 6, 1959, President Eisenhower delivered an address from his White House office on the need for effective labor reform. In this speech, the President called for restrictions on secondary consumer picketing. In discussing such picketing, President Eisenhower gave the following example:

> Take another company—let us say, a furniture manufacturer. The employees vote against joining a particular union. Instead of picketing the furniture plant itself, unscrupulous organizing officials, in this case, use another scheme. They picket the stores which sell the furniture this plant manufactures. The purpose is to prevent those stores from handling that furniture.
>
> How can anyone justify this kind of pressure against stores which are not involved in any dispute. They are innocent bystanders. This kind of action is designed to make the furniture stores bring pressure on a furniture plant and its employees—to force those employees into a union they do not want. This is an example of a secondary boycott.
>
> I want that sort of thing stopped. So does America.

105 Cong.Rec. A8488 (1959), *reprinted in* 2 Leg.Hist. at 1842. Thus, President Eisenhower, in calling the attention of Congress and the nation to secondary action directed at consumers, framed the problem solely in terms of consumer picketing.

As the Supreme Court in *Tree Fruits* pointed out, later during House debates, Rep. Griffin "did discuss consumer *picketing,* but only in the context of its abuse when directed against shutting off the patronage of a secondary employer." *Tree Fruits,* 377 U.S. at 67, 84 S.Ct. at 1069 (emphasis added). In the following colloquy, which took place six days after the President's address, Rep. Griffin discussed secondary action aimed at consumers:

MR. BROWN Of Ohio...

. . . .

My question concerns the picketing of consumer entrances to retail stores selling goods manufactured under strike. Would that situation be prohibited under the gentleman's bill?

MR. GRIFFIN. Let us take for example the case that the President talked about in his recent radio address. A few newspapers reported that the secondary boycott described by the President would be prohibited under the present act. It will be recalled that the case involved a dispute with a company that manufactured furniture. Let us understand that we are not considering, as I understand your question, the right to picket at the manufacturing plant where the dispute exists.

MR. BROWN Of Ohio. That is right. We are looking only at the problem of picketing at a retail store where the furniture is sold.

MR. GRIFFIN. Then, we are not talking about picketing at the place of the primary dispute. We are concerned about picketing at the store where the furniture is sold. Under the present law, if the picketing happens to be at the employee entrance so that clearly the purpose of the picketing is to induce the employees of the secondary employer not to handle the products of the primary employer, the boycott could be enjoined.

However, if the picketing happened to be around at the consumer entrance, and if the purpose of the picketing were to coerce the employer not to handle those goods, then under the present law, because of technical interpretations, the boycott would not be covered.

MR. BROWN Of Ohio. In other words, the Taft-Hartley Act does not cover such a situation now?

MR. GRIFFIN. The way it has been interpreted.

MR. BROWN Of Ohio. But the Griffin-Landrum bill would?

MR. GRIFFIN. Our bill would; that is right. If the purpose of the picketing is to coerce or restrain the employer of

that second establishment, to get him not to do business with the manufacturer—then such a boycott could be stopped.

MR. BROWN Of Ohio. Not to sell goods of some concern that is on strike. Would that same rule apply to the picketing at the consumer entrances, for instance, of plumbing shops, or newspapers that might run the advertising of these concerns, or radio stations that might carry their program?

MR. GRIFFIN. Of course, this bill and any other bill is limited by the constitutional right of free speech. If the purpose of the picketing is to coerce the retailer not to do business with the manufacturer, whether it is plumbing—

MR. BROWN Of Ohio. Advertising.

MR. GRIFFIN. Advertising, or anything else, it would be covered by our bill. It is not covered now.

105 Cong.Rec. 14,339 (1959), *reprinted in* 2 Leg.Hist. at 1615. It is clear from the above colloquy that Rep. Griffin, who introduced the bill which was eventually passed by the House and whose bill contained the restricting amendments which eventually became law, clearly had in mind only prohibiting consumer picketing by his proposed amendments to § 8(b)(4).[14] Moreover, it is clear that he recognized that his bill was limited by the constitutional right of free speech.

The only suggestion in either house of Congress that the proposed amendments to § 8(b)(4) would apply to nonpicketing labor

publicity came from opponents of the amendments. As the Supreme Court pointed out in *Tree Fruits*, "Senator Humphrey first sounded the warning early [in the Senate debates]." *Tree Fruits*, 377 U.S. at 66, 84 S.Ct. at 1068. In *Tree Fruits*, however, the Supreme Court stated that the interpretation which the opponents of a bill gave to that bill was not controlling. The Court explained:

[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach. "The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt."

*Tree Fruits*, 377 U.S. at 66, 84 S.Ct. at 1068 (citations omitted). The Court therefore refused to give any weight to the interpretations suggested by Senator Humphrey and Senator Morse, another opponent of the amendments to § 8(b)(4). *Id.*

A House-Senate conference committee, chaired by Senator Kennedy, considered the Landrum-Griffin bill and the Kennedy-Ervin bill and reached a conference agreement. The suggestions of the committee regarding § 8(b)(4) were enacted into law. The conference committee agreed to recommend the amendments to § 8(b)(4) contained in the Landrum-Griffin bill. (The

---

**14.** The Supreme Court has stated, "the prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise." *Tree Fruits*, 377 U.S. at 68, 84 S.Ct. at 1069. The NLRB argues that by stating that coercive conduct might be "picketing or *otherwise*," the Supreme Court recognized that § 8(b)(4) might prohibit nonpicketing publicity. The prohibitions of § 8(b)(4) were intended to apply to actions other than picketing, *e.g.*, direct threats to the secondary employer, actions aimed at the secondary employer's employees, or strikes.

The activities other than picketing to which § 8(b)(4) has been held to apply have involved conduct in addition to communicative activity. Among the variety of courses of conduct which have been held to be coercive under § 8(b)(4) are: two unions' demands for monetary settle-

ment payments for contract violations, *Electro-Coal Transfer Corp. v. General Longshore Workers*, 591 F.2d 284 (5th Cir.1979); a union's threat to terminate an agreement under which it served as a bargaining agent on a construction project unless the primary contractor took a subcontractor off the job, *NLRB v. IBEW*, 405 F.2d 159 (9th Cir.1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969); union's economic sanction of refusing to refer its members for employment as it was bound to by agreement, *NLRB v. Local 825, Int'l Union of Operating Engineers*, 315 F.2d 695 (3d Cir.1963). Thus, "otherwise" could refer to many types of conduct. There is no indication that either the Court or any proponent of the amendments to § 8(b)(4) intended that they apply to nonpicketing labor publicity.

Kennedy-Ervin bill contained no amendments to § 8(b)(4).) In response to the fears of the opponents of the amendments to § 8(b)(4), the conference committee drafted the publicity proviso to § 8(b)(4), which protects union appeals made through handbilling, advertising, and other nonpicketing publicity to consumers not to deal with a secondary employer who has a "producer-distributor" relationship with a primary employer. *DeBartolo I*, 463 U.S. at 156, 103 S.Ct. at 2932. The proviso " 'was the outgrowth of a profound Senate concern that the unions' freedom to appeal to the public for support of their case be adequately safeguarded.' *NLRB v. Servette, Inc.*, 377 U.S. 46, 55, 84 S.Ct. 1098, 1104, 12 L.Ed.2d 121 (1964)." *DeBartolo I*, 463 U.S. at 157 n. 10, 103 S.Ct. at 2933 n. 10.

■ The publicity proviso was clearly drafted to cover nonpicketing labor publicity in the only example of secondary consumer activity which had been discussed— *secondary union action taken against a retail store selling a struck manufacturer's product.* This paradigm had been placed before the nation and Congress by President Eisenhower in his August 6 radio address. Senator McClellan and Rep. Griffin also focused on this typical case. The legislators who feared that the amendments proposed to § 8(b)(4) would cover nonpicketing labor publicity also discussed such publicity in terms of this paradigm case.[15] However, the fact that the publicity proviso was drafted in terms of the paradigm case, does not change the fact

that at no time had a proponent of the amendments to § 8(b)(4) stated that nonpicketing should be or was being prohibited by the amendments.

■ The Board argues that the publicity proviso is an exception to the prohibitions contained in § 8(b)(4). The Board contends that if Congress had not intended to restrict nonpicketing publicity under § 8(b)(4)(ii)(B), it would not have drafted the publicity proviso. In a case of a true statutory exception what the Board argues would be true—an exception exists only to exempt something which would otherwise be covered. However, the legislative history makes it clear that not only did the supporters of the amendments to § 8(b)(4) intend only to prohibit consumer *picketing*, but also that the publicity proviso was inserted both to clarify their position that nonpicketing publicity was not prohibited and, most importantly, to allay the fears of the opponents of the amendments that such speech would be restricted.

In the House, Rep. Griffin and, in the Senate, Senator Goldwater, introduced a report summarizing the "nature of the settlement reached by the conference on the important points of difference between the House and the Senate bill [sic]." 105 Cong. Rec. 16,539 (1959), *reprinted in* 2 Leg.Hist. at 1712 (quoting Congressman Griffin), and 105 Cong.Rec. 16,435 (1959), *reprinted in* 2 Leg.Hist. at 1453 (Senator Goldwater). The report contained the following summary analysis of Title VII of the bill, which included the amendments to § 8(b)(4):

*Summary analysis of conference agreement as to title VII, Taft-Hartley amendments*

| | House bill (Landrum-Griffin) | Senate bill (Kennedy-Ervin) | Conference agreement |
| --- | --- | --- | --- |
| I. No man's land ...... ........ | State labor boards and courts could assume jurisdiction and apply State law as to cases declined by NLRB. (Administration recommendation.) | State boards only (12 States) could take jurisdiction—and apply Federal law—to cases declined by NLRB. | Adopts House provision in full. Adds provision to assure that NLRB will continue to take cases falling under its standards as of Aug. 1, 1959; and allows Board to delegate to its regional directors certain powers in representation cases. |
| II. Hot cargo agreements....... | Bans all hot cargo agreements . | Bans only hot cargo agreements with motor carriers subject to pt. II of Interstate Commerce Act. | Adopts House provision with modification as to application in garment and construction industries. |

15. *See, e.g.,* 105 Cong.Rec. 5580 (1959), *reprinted in* 2 Leg.Hist. at 1037 (Senator Humphrey); 105 Cong.Rec. 15,222 (1959), *reprinted in* 2 Leg.Hist. at 1708 (Rep. Thompson and Senator Kennedy).

*Summary analysis of conference agreement as to title VII, Taft-Hartley amendments*

| | House bill (Landrum-Griffin) | Senate bill (Kennedy-Ervin) | Conference agreement |
|---|---|---|---|
| III. Other secondary boycotts.... | 1. Closes loophole which permitted secondary boycott through coercion applied directly against secondary employer (instead of his employees). | No provision................. | Adopts House provision. |
| | 2. Closes loophole which permitted secondary boycott by inducing employees individually (rather than in concert). | .....do...................... | Do. |
| | 3. Closes loophole which permitted secondary boycotts involving railroads, municipalities, and governmental agencies because their employees were not "employees" under definition in the act. | .....do...................... | Do. |
| | 4. Prohibits secondary customer picketing at retail store which happens to sell product produced by manufacturer with whom union has dispute. | .....do...................... | Adopts House provision with clarification that other forms of publicity are not prohibited; also clarification that picketing at primary site is not secondary boycott. |
| IV. Organizational picketing..... | 1. After an election, bans picketing for 12 months. | Same, except 9 months........ | Adopts House provision. |
| | 2. Bans picketing when another union certified or lawfully recognized. | Same........................ | Same. |
| | 3. Before election, restricts picketing to reasonable time not to exceed 30 days. | No provision................. | Adopts House provision. |
| | 4. Before election, restricted picketing unless union could show 30 percent interest among employees. | .....do...................... | Substitutes mandatory election procedure. Informational picketing which does not affect deliveries or service is not banned. |
| | 5. Provides for enforcement through mandatory injunction obtained through NLRB, and/or suit for damages. | Discretionary injunction by NLRB. Union could delay issuance of injunction and continue picketing by charging employer with unfair labor practices. | Mandatory injunction; no damage suit; union can charge unfair practices but cannot block injunction except in limited situations under sec. 3(a)(2). |
| V. Other provisions: 1. Voting by economic strikers. ........... | Employer could not petition during economic strike for election for 1 year. | Economic strikers could vote without limitation. | Can vote during period of 1 year after strike commences. |
| 2. Prehire, building and construction industry. | Sec. 702. Administration provision. .................... | Broader provision. Sec. 702 ... | Adopts Senate provision. |
| 3. General Counsel, vacancy. .............. | Sec. 704..................... | Same........................ | Same. |
| 4. Priority handling of certain unfair labor charges. | Sec. 706..................... | Same........................ | Same. |
| 5. Common situs, building and construction industry. | No provision................. | No provision................. | Dropped. |

105 Cong.Rec. 17,181 (1959), *reprinted in* 2 Leg.Hist. at 1454; 105 Cong.Rec. 16,539–40 (1959), *reprinted in* 2 Leg.Hist. at 1712–13.

Regarding secondary boycotts, the summary analysis quoted above indicates that the House bill was designed to ban all hot cargo agreements, close the three loopholes in Taft-Hartley identified above, and prohibit secondary customer *picketing* at retail stores which sell a product produced by a manufacturer with whom the union has a primary dispute. The Senate bill applied only to certain hot cargo agreements. It contained no provisions regarding the three Taft-Hartley loopholes or secondary customer picketing. The conference agreement indicates that the House provision as to hot cargo agreements was adopted with

certain exceptions and that the three Taft-Hartley loopholes were closed as provided for in the House bill. As to secondary customer picketing, the summary analysis states:

> Adopts House provision with clarification that other forms of publicity are not prohibited; also clarification that picketing at primary site is not secondary boycott.

105 Cong.Rec. 17,181 (1959), *reprinted in* 2 Leg.Hist. at 1454; 105 Cong.Rec. 16,539 (1959), *reprinted in* 2 Leg.Hist. at 1712.

 The summary analysis makes it clear that the prohibition on secondary actions directed at consumers restricts only "secondary customer picketing." The summary analysis further points out that the publicity proviso is not an exception which exempts nonpicketing publicity which would otherwise be prohibited by the restrictions in the amendments to § 8(b)(4).

Instead, the summary analysis explains that the publicity proviso is a clarification of the fact that the prohibition was never intended to apply to nonpicketing publicity.[16]

The summary analysis explains that a "clarification that picketing at primary site is not secondary boycott" was also added to § 8(b)(4). Just as the proponents of the amendments to § 8(b)(4) did not intend the language of their amendments to reach picketing at the primary site, they did not intend the language of their prohibitions to reach nonpicketing publicity.[17] In both cases the summary analysis uses the term "clarification" to describe the provisos. Neither proviso was an exception; instead they were added to make clear that the prohibitory language does not reach primary picketing or nonpicketing publicity.[18]

**16.** Regarding the publicity proviso, the Supreme Court in its *Tree Fruits* opinion stated:

> [T]he Senate conferees refused to accede to the House proposal without safeguards for the right of unions to appeal to the public, even by some conduct which might be "coercive." The result was the addition of the proviso. But it does not follow from the fact that some course of conduct was protected by the proviso, that the exception "other than picketing" indicates that Congress had determined that all consumer picketing was coercive.

*Tree Fruits,* 377 U.S. at 69, 84 S.Ct. at 1070. It seems that the Supreme Court suggested, in dictum, that the publicity proviso exempted nonpicketing publicity which would have been coercive and therefore violative of the amendments to § 8(b)(4). It is true that several Senators and Congressmen feared that nonpicketing publicity might be covered by the prohibition against "coercive" conduct. However, as pointed out above, the fears and doubts of the opposition are not authoritative as to the scope of the prohibition. As discussed more fully above, nowhere in the legislative history is there any indication that the sponsors of the amendments to § 8(b)(4) intended to restrict nonpicketing labor publicity.

**17.** The Supreme Court has stated that in order that the amendments to § 8(b)(4) "not be read as supporting a construction of the statute as prohibiting the incidental effects of traditional primary activity, Congress added the proviso that nothing in the amended section 'shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.' Many statements and examples proferred in the 1959 debates confirm this con-

gressional acceptance of the distinction between primary and secondary activity." *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 632–33, 87 S.Ct. 1250, 1262, 18 L.Ed.2d 357 (1967) (footnotes omitted). Thus, one of § 8(b)(4)'s provisos was certainly not drafted as an exception, but rather as an explanation of Congress' intent not to reach such conduct by its prohibition.

**18.** Because of the publicity proviso, there has been little occasion for courts to consider whether nonpicketing publicity is prohibited by the statute. However, the NLRB argues that two circuit courts of appeal have indicated that handbilling in support of a total boycott is coercive within the meaning of § 8(b)(4)(ii)(B). In *Great Western Broadcasting Corp. v. NLRB,* 356 F.2d 434 (9th Cir.), *cert. denied,* 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966), the Ninth Circuit affirmed a Board decision that certain publicity fell within the publicity proviso. However, the Ninth Circuit included the following dictum in its opinion:

> The prohibition set forth in § 8(b)(4)(ii)(B) covers the cited union activity, else KXTV would not have a case to begin with.

*Id.* at 436. This quote is mere dictum given that the Ninth Circuit had already decided that the challenged activity was permissible in light of the publicity proviso.

In *Honolulu Typographical Union v. NLRB,* 401 F.2d 952 (D.C.Cir.1968), the D.C. Court of Appeals enforced a decision and order of the Board that picketing and handbilling on a secondary site was unlawful. However, the court of appeals did not address the question of whether handbilling was prohibited by the stat-

Moreover, the publicity proviso is not drafted in the terms of an exception. Instead, it is drafted as an interpretive, explanatory section. The publicity proviso begins as follows: *"Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity other than picketing...." The fact that the publicity proviso says "nothing ... shall be *construed* to prohibit publicity" indicates that this proviso only explains how the prohibitions of the statute should be interpreted rather than creating an exception to the prohibitions contained in the statute. (Emphasis added).[19]

After the conference was complete, Senator Kennedy, a proponent of the publicity proviso, and Senator Goldwater, a proponent of the amendments to § 8(b)(4) engaged in the following colloquy:

MR. KENNEDY. [Discussing the conference agreement]

....

Accordingly, the Senate conferees insisted that the report secure the following rights:

....

(c) The right to appeal to consumers by methods other than picketing asking them to refrain from buying goods made by nonunion labor and to refrain from trading with a retailer who sells such goods.

Under the Landrum Griffin Bill it would have been impossible for a union to inform the customers of a secondary employer that that employer or store was selling goods which were made under racket conditions or sweatshop conditions, or in a plant where an economic strike was in progress. We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activities short of picketing. In other words, the union can hand out handbills at the shop, can place advertisements in the newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site.

MR. GOLDWATER. Mr. President, will the Senator yield at that point for a question?

MR. KENNEDY. I yield.

MR. GOLDWATER. I have been asked by the people who are vitally concerned whether there is anything in the

ute. It merely assumed this, focusing instead on whether the handbilling was truthful for the purposes of falling within the scope of the publicity proviso. *Id.* at 957–58.

**19.** In *DeBartolo I,* the Supreme Court stated "when Congress legislates in a fashion that restricts communicative activity, it expects the statutory language to be construed narrowly." 463 U.S. at 157 n. 10, 103 S.Ct. at 2933 n. 10 (citation omitted). The Court continued, "It does not, however, expect the statutory language to be deprived of substantial practical effect." *Id.* The NLRB argues that if § 8(b)(4) is construed to apply to nonpicketing publicity, the publicity proviso will have been deprived of "substantial practical effect." This would be true if the publicity proviso were indeed an exception to a statutory prohibition which had been designed to cover both picketing and nonpicketing labor publicity. However, the language of the proviso and the legislative history make it abundantly clear that the proviso was a "clarification" of the reach of the statutory prohibition and that the proponents of the amend-

ments to § 8(b)(4) never intended to reach nonpicketing publicity.

Moreover, the Supreme Court premised its statement that statutory language should not be "deprived of substantial practical effect" on the assumption that the statutory language in question was designed to "restrict [ ] communicative activity." The proviso was not designed to restrict communicative activity; only the prohibitions of § 8(b)(4) were intended to do so. Although, under our narrow construction of the prohibitions set out in § 8(b)(4), handbilling is not restricted, the portions of the amendments to § 8(b)(4) which restrict communicative activity continue to have substantial practical effect—they regulate picketing, strikes, threats to employers, etc.

Thus, our decision does not interpret any portion of § 8(b)(4) as meaningless verbiage. The restrictive sections of the statute were intended to proscribe many union activities and continue to do so. The publicity proviso was intended to allay the fears of the opponents of the restrictions and clarify the interpretation of the restrictions.

conference report which would limit or prohibit the buy-America campaigns which are being carried on by certain unions and business groups, and even by some governmental bodies. I should like to ask the distinguished chairman of the conference committee whether the report was intended to have this effect. It is certainly my conviction that no such effect was intended, either by the Senate or by the conferees.

MR. KENNEDY. I know that a good deal of effort has been made by some groups of workers, such as those who work on hats, to make sure that their working standards are protected. The answer to the Senator's question is no, it was not intended that the conference report have such an effect. I am glad that we have had the opportunity to establish legislative history in this matter.

20. In analyzing the conference committee's work, Senator Kennedy stated:

Secondly, the House Bill prohibited the union from carrying on any kind of activity to disseminate informational material to secondary sites. They could not say that there was a strike in a primary plant.

We quite obviously are opposed to their affecting liberties in a secondary strike or affecting employees joining, but the House language prohibited not only secondary picketing, but even the handing out of handbills or even taking out an advertisement in a newspaper.

Under the language of the conference, we agreed there would not be picketing at a secondary site. What was permitted was the giving out of handbills or information through the radio, and so forth.

105 Cong.Rec. 16,254–55 (1959), *reprinted in* 2 Leg.Hist. at 1388–89. The NLRB argues because Senator Kennedy was acting as chairman of the conference committee and recommending the conference committee's version of the amendments to the NLRA, his statements were not those of an opponent of the amendments to § 8(b)(4) but, rather, are entitled to authoritative weight. However, Senator Kennedy was never a proponent of amendments to § 8(b)(4). His Senate bill did not contain such amendments. It was the bill which had originated in the House, the Landrum-Griffin bill, which contained such restrictions. It is clear that Senator Kennedy's description of the scope of the restrictions contained in the amendments to § 8(b)(4) was made in light of his fears that those restrictions might be interpreted to pre-

105 Cong.Rec. 16,413–14 (1959), *reprinted in* 2 Leg.Hist. at 1431–32. Just as the summary analysis introduced by Senator Goldwater and Rep. Griffin indicated that the publicity proviso was a "clarification that other forms of publicity are not prohibited," Senator Kennedy's initial statement above indicates that he believed that the publicity proviso meant that "the union shall be free to conduct informational activity short of picketing." [20] The above colloquy also points out Senator Goldwater's concerns that the prohibitions of the statute not affect free speech.[21]

In speaking in support of the conference bill, Senator Goldwater, a member of the conference committee and an ardent supporter of the amendments to § 8(b)(4), stated:

The Senate bill did not deal with the subject of secondary boycotts. The House bill, however, closed up every

clude nonpicketing publicity—fears which were allayed by the construction of the restrictions detailed in the publicity proviso. It is still fair to say that Senator Kennedy's "fears and doubts ... are no authoritative guide to the construction of [the] legislation." *Tree Fruits,* 377 U.S. at 66, 84 S.Ct. at 1068.

21. First Amendment considerations had been placed before the Senate during preconference debates by, among others, Senator Humphrey:

The Board has indeed held that to place an employer on a "We Do Not Patronize" list is to restrain and coerce him. The Court of Appeals for the Ninth Circuit set aside the Board's determination and pointed out that the union's conduct was "within the general area of protection of the first amendment guaranteeing free speech." (*NLRB v. IAM, Local 942, CA9,* No. 15, 814, Feb. 4, 1959, sl. op. p. 6).

I fear that this proposal may well invade this area. I ask the Senate to hold with Chief Justice Stone that the "publication, unaccompanied by violence, of a notice that the employer is unfair to organized labor and requesting the public not to patronize him is an exercise of the right of free speech guaranteed by the first amendment which cannot be made unlawful by an act of Congress."

The citation is a familiar one to lawyers and even to some of us laymen: *United States v. Hutcheson,* 312 U.S. 219, 243, [61 S.Ct. 463, 471, 85 L.Ed. 788].

105 Cong.Rec. 5580 (1959), *reprinted in* 2 Leg. Hist. at 1037.

loophole in the boycott section of the law including the use of a secondary picket line, an example of which the President gave on his nationwide TV program on August 6.

105 Cong.Rec. 16,419 (1959), *reprinted in* 2 Leg.Hist. at 1437. Thus, again a proponent of the amendments to § 8(b)(4) indicated, while the final version of the bill was pending, that prohibition extended only to picketing. Senator Goldwater made no mention of nonpicketing distribution of publicity in explaining why the amendments to § 8(b)(4) were necessary.

Similarly, in speaking in support of the conference bill, Senator Curtis, a proponent of the amendments to § 8(b)(4), stated:

> The objectives of the secondary boycott provisions of the bill before us are substantially the same as those contained in the bills which I have introduced over the past several years. In a word, the overall objective has been to close the loopholes that had developed in the secondary boycott protection afforded by the Taft-Hartley Act.

105 Cong.Rec. 16,423 (1959), *reprinted in* 2 Leg.Hist. at 1441. It is clear that the major purpose of the amendments remained the closing of the loopholes in Taft-Hartley and that nonpicketing publicity was not a target of the prohibitions.

In summary, we can ascertain no affirmative intention of Congress clearly expressed to prohibit nonpicketing labor publicity. As pointed out in *Tree Fruits*, it was only in the later debates of the labor reform bill, after President Eisenhower had focused attention on consumer picketing of a retail distributor of a struck manufacturer, that both houses began to consider that the amendments should apply to consumer picketing. Nowhere, except in the statements of the opposition, is there any suggestion that the amendments to § 8(b)(4) would prohibit nonpicketing labor publicity.

## V.

In conclusion, we cannot find any indication that the entirely peaceful and orderly distribution of handbills, as in the instant case, was intended to be proscribed by Congress. We therefore apply the rule of *Catholic Bishop*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), to the effect that before interpreting this statute in a manner that "would give rise to serious constitutional questions," *id.* at 501, 99 S.Ct. at 1319, we must first find "the affirmative intention of the Congress clearly expressed." *Id.* Absent such a finding we must GRANT the Union's petition for review and DENY enforcement of the order of the Board.