EDWARD J. DeBARTOLO CORP. *v.* FLORIDA GULF
COAST BUILDING & CONSTRUCTION TRADES
COUNCIL ET AL.

No. 86–1461.   Argued January 20, 1988—Decided April 20, 1988

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR and SCALIA, JJ., concurred in the judgment. KENNEDY, J., took no part in the consideration or decision of the case.

*Lawrence M. Cohen* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Cohen* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Rosemary M. Collyer, Norton J. Come, Linda Sher,* and *Carmel P. Ebb.*

*Laurence Gold* argued the cause for respondent Florida Gulf Coast Building and Construction Trades Council. With him on the brief were *Mark F. Kelly, Laurence J. Cohen, David M. Silberman, George Kaufmann,* and *Marsha Berzon.*

*Solicitor General Fried* and *Rosemary M. Collyer* filed a brief for the National Labor Relations Board, as respondent under this Court's Rule 19.6, in support of petitioner.*

JUSTICE WHITE delivered the opinion of the Court.

This case centers around the respondent union's peaceful handbilling of the businesses operating in a shopping mall in Tampa, Florida, owned by petitioner, the Edward J. DeBartolo Corporation (DeBartolo). The union's primary labor dispute was with H. J. High Construction Company (High) over alleged substandard wages and fringe benefits. High was retained by the H. J. Wilson Company (Wilson) to construct a department store in the mall, and neither DeBartolo nor any of the other 85 or so mall tenants had any contractual right to influence the selection of contractors.

The union, however, sought to obtain their influence upon Wilson and High by distributing handbills asking mall customers not to shop at any of the stores in the mall "until the Mall's owner publicly promises that all construction at the Mall will be done using contractors who pay their employees fair wages and fringe benefits."[1] The handbills'

---

*Briefs of *amici curiae* urging reversal were filed for the American Retail Federation by *Jack L. Whitacre;* for the Chamber of Commerce of the United States by *Edward B. Miller* and *Stephen A. Bokat;* and for the International Council of Shopping Centers, Inc., by *Edward J. Sack* and *Stephanie McEvily.*

*John A. Powell, Helen Hershkoff, Steven R. Shapiro, C. Edwin Baker, Robert A. Bush,* and *Ira L. Gottlieb* filed a brief for the American Civil Liberties Union Foundation as *amicus curiae* urging affirmance.

[1] The Handbill read:

"PLEASE *DON'T SHOP AT EAST LAKE SQUARE MALL* PLEASE

"The FLA. GULF COAST BUILDING TRADES COUNCIL, AFL–CIO, is requesting that you do not shop at the stores in the East Lake Square Mall because of The Mall ownership's contribution to substandard wages.

"The Wilson's Department Store under construction on these premises is being built by contractors who pay substandard wages and fringe benefits. In the past, the Mall's owner, The Edward J. DeBartolo Corporation, has supported labor and our local economy by insuring that the Mall and its

message was that "[t]he payment of substandard wages not only diminishes the working person's ability to purchase with earned, rather than borrowed, dollars, but it also undercuts the wage standard of the entire community." The handbills made clear that the union was seeking only a consumer boycott against the other mall tenants, not a secondary strike by their employees. At all four entrances to the mall for about three weeks in December 1979, the union peacefully distributed the handbills without any accompanying picketing or patrolling.

After DeBartolo failed to convince the union to alter the language of the handbills to state that its dispute did not involve DeBartolo or the mall lessees other than Wilson and to limit its distribution to the immediate vicinity of Wilson's construction site, it filed a complaint with the National Labor Relations Board (Board), charging the union with engaging in unfair labor practices under § 8(b)(4) of the National

---

stores be built by contractors who pay fair wages and fringe benefits. Now, however, and for no apparent reason, the Mall owners have taken a giant step backwards by permitting our standards to be torn down. The payment of substandard wages not only diminishes the working person's ability to purchase with earned, rather than borrowed, dollars, but it also undercuts the wage standard of the entire community. Since low construction wages at this time of inflation means decreased purchasing power, do the owners of East Lake Mall intend to compensate for the decreased purchasing power of workers of the community by encouraging the stores in East Lake Mall to cut their prices and lower their profits?

"CUT-RATE WAGES ARE NOT FAIR UNLESS MERCHANDISE PRICES ARE ALSO CUT-RATE.

"We ask for your support in our protest against substandard wages. Please do not patronize the stores in the East Lake Square Mall until the Mall's owner publicly promises that all construction at the Mall will be done using contractors who pay their employees fair wages and fringe benefits.

"IF YOU MUST ENTER THE MALL TO DO BUSINESS, please express to the store managers your concern over substandard wages and your support of our efforts.

"We are appealing only to the public—the consumer. We are not seeking to induce any person to cease work or to refuse to make deliveries."

Labor Relations Act (NLRA), 61 Stat. 141, as amended, 29 U. S. C. § 158(b)(4).[2] The Board's General Counsel issued a complaint, but the Board eventually dismissed it, concluding that the handbilling was protected by the publicity proviso of § 8(b)(4). *Florida Gulf Coast Bldg. & Constr. Trades Coun-*

---

[2] That section provides in pertinent part:

"§ 158.   Unfair labor practices

.            .            .            .            .

"(b) Unfair labor practices by labor organization

"It shall be an unfair labor practice for a labor organization or its agents —

.            .            .            .            .

"(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is —

.            .            .            .            .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

.            .            .            .            .

". . . *Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution."

*cil*, 252 N. L. R. B. 702 (1980). The Court of Appeals for the Fourth Circuit affirmed the Board, 662 F. 2d 264 (1981), but this Court reversed in *Edward J. DeBartolo Corp.* v. *NLRB*, 463 U. S. 147 (1983). There, we concluded that the handbilling did not fall within the proviso's limited scope of exempting "publicity intended to inform the public that the primary employer's product is 'distributed by' the secondary employer" because DeBartolo and the other tenants, as opposed to Wilson, did not distribute products of High. *Id.*, at 155–157. Since there had not been a determination below whether the union's handbilling fell within the prohibition of § 8(b)(4), and, if so, whether it was protected by the First Amendment, we remanded the case.

On remand, the Board held that the union's handbilling was proscribed by § 8(b)(4)(ii)(B). 273 N. L. R. B. 1431 (1985). It stated that under its prior cases "handbilling and other activity urging a consumer boycott constituted coercion." *Id.*, at 1432. The Board reasoned that "[a]ppealing to the public not to patronize secondary employers is an attempt to inflict economic harm on the secondary employers by causing them to lose business," and "such appeals constitute 'economic retaliation' and are therefore a form of coercion." *Id.*, at 1432, n. 6. It viewed the object of the handbilling as attempting "to force the mall tenants to cease doing business with DeBartolo in order to force DeBartolo and/or Wilson's not to do business with High." *Id.*, at 1432. The Board observed that it need not inquire whether the prohibition of this handbilling raised serious questions under the First Amendment, for "the statute's literal language and the applicable case law require[d]" a finding of a violation. *Ibid.* Finally, it reiterated its longstanding position that "as a congressionally created administrative agency, we will presume the constitutionality of the Act we administer." *Ibid.*

The Court of Appeals for the Eleventh Circuit denied enforcement of the Board's order. *Florida Gulf Coast Bldg. & Constr. Trades Council* v. *NLRB*, 796 F. 2d 1328,

1346 (1986). Because there would be serious doubts about whether § 8(b)(4) could constitutionally ban peaceful hand-billing not involving nonspeech elements, such as patrolling, the court applied our decision in *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490 (1979), to determine if there was a clear congressional intent to proscribe such handbilling. The language of the section, the court held, revealed no such intent, and the legislative history indicated that Congress, by using the phrase "threaten, coerce, or restrain," was concerned with secondary picketing and strikes rather than appeals to consumers not involving picketing. 796 F. 2d, at 1336–1340. The court also concluded that the publicity proviso did not manifest congressional intent to ban all speech not coming within its terms because it was "drafted as an interpretive, explanatory section" and not as an exception to an otherwise all-encompassing prohibition on publicity in § 8(b)(4). *Id.,* at 1344. The court went on to construe the section as not prohibiting consumer publicity; DeBartolo petitioned for certiorari. Because this case presents important questions of federal constitutional and labor law, we granted the petition, 482 U. S. 913 (1987), and now affirm.

The Board, the agency entrusted by Congress with the authority to administer the NLRA, has the "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 236 (1963); see *Pattern Makers* v. *NLRB,* 473 U. S. 95, 114 (1985); *NLRB* v. *Steelworkers,* 357 U. S. 357, 362–363 (1958). Here, the Board has construed § 8(b)(4) of the Act to cover handbilling at a mall entrance urging potential customers not to trade with any retailers in the mall, in order to exert pressure on the proprietor of the mall to influence a particular mall tenant not to do business with a nonunion construction contractor. That statutory interpretation by the Board would normally be entitled to deference unless that construction were clearly contrary to the intent of Congress. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843, and n. 9 (1984).

Another rule of statutory construction, however, is pertinent here: where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. *Catholic Bishop, supra,* at 499–501, 504. This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray* v. *The Charming Betsy,* 2 Cranch 64, 118 (1804), and has for so long been applied by this Court that it is beyond debate. *E. g., Catholic Bishop, supra,* at 500–501; *Machinists* v. *Street,* 367 U. S. 740, 749–750 (1961); *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932); *Lucas* v. *Alexander,* 279 U. S. 573, 577 (1929); *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 390 (1924); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408 (1909); *Parsons* v. *Bedford,* 3 Pet. 433, 448–449 (1830) (Story, J.). As was stated in *Hooper* v. *California,* 155 U. S. 648, 657 (1895), "[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it. See *Grenada County Supervisors* v. *Brogden,* 112 U. S. 261, 269 (1884).

We agree with the Court of Appeals and respondents that this case calls for the invocation of the *Catholic Bishop* rule, for the Board's construction of the statute, as applied in this case, poses serious questions of the validity of § 8(b)(4) under the First Amendment. The handbills involved here truthfully revealed the existence of a labor dispute and urged potential customers of the mall to follow a wholly legal course of action, namely, not to patronize the retailers doing business in the mall. The handbilling was peaceful. No picketing or

patrolling was involved. On its face, this was expressive activity arguing that substandard wages should be opposed by abstaining from shopping in a mall where such wages were paid. Had the union simply been leafletting the public generally, including those entering every shopping mall in town, pursuant to an annual educational effort against substandard pay, there is little doubt that legislative proscription of such leaflets would pose a substantial issue of validity under the First Amendment. The same may well be true in this case, although here the handbills called attention to a specific situation in the mall allegedly involving the payment of unacceptably low wages by a construction contractor.

That a labor union is the leafletter and that a labor dispute was involved does not foreclose this analysis. We do not suggest that communications by labor unions are never of the commercial speech variety and thereby entitled to a lesser degree of constitutional protection. The handbills involved here, however, do not appear to be typical commercial speech such as advertising the price of a product or arguing its merits, for they pressed the benefits of unionism to the community and the dangers of inadequate wages to the economy and the standard of living of the populace. Of course, commercial speech itself is protected by the First Amendment, *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 762 (1976), and however these handbills are to be classified, the Court of Appeals was plainly correct in holding that the Board's construction would require deciding serious constitutional issues. See *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 534–535, 537 (1980); *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 102–103 (1979); *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419–420 (1971).

The Board was urged to construe the statute in light of the asserted constitutional considerations, but thought that it was constrained by its own prior authority and cases in the Courts of Appeals, as well as by the express language of

the Act, to hold that § 8(b)(4) must be construed to forbid the handbilling involved here. Even if this construction of the Act were thought to be a permissible one, we are quite sure that in light of the traditional rule followed in *Catholic Bishop*, we must independently inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed to § 8(b)(4)(ii)(B). This the Court has done in several cases.

In *NLRB* v. *Drivers*, 362 U. S. 274, 284 (1960), for example, the Court rejected the Board's interpretation of the phrase "restrain or coerce" to include peaceful recognitional picketing and stated:

> "In the sensitive area of peaceful picketing Congress has dealt explicitly with isolated evils which experience has established flow from such picketing. Therefore, unless there is the clearest indication in the legislative history of § 8(b)(1)(A) supporting the Board's claim of power under that section, we cannot sustain the Board's order here. We now turn to an examination of the legislative history."

That examination of the legislative history failed to yield the requisite "clearest indication." Similarly, in *NLRB* v. *Fruit Packers*, 377 U. S. 58, 63 (1964) *(Tree Fruits)*, we disagreed with the Board's determination that § 8(b)(4)(ii)(B) prohibited all consumer picketing at a secondary establishment, no matter the economic consequences of that picketing, because our examination of the legislative history led us to "conclude that it does not reflect with the requisite clarity a congressional plan to proscribe all peaceful consumer picketing at secondary sites, and, particularly, any concern with peaceful picketing when it is limited, as here, to persuading" customers not to purchase a specific product of the secondary establishment. We once more looked for the "isolated evils" that Congress had focused on because "[b]oth the congressional policy and our adherence to this principle of interpretation

reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment." *Id.*, at 62–63; see *id.*, at 67, 71. Because there was not the required "clearest indication in the legislative history," we rejected the Board's interpretation that limited expressive activities. Again, in *Catholic Bishop*, we independently determined whether the Board's jurisdiction extended to parochial schools in the face of a substantial First Amendment challenge, although the Board itself had previously considered the First Amendment challenge and presumably interpreted the statute cognizable of those limits. 440 U. S., at 497–499.

We follow this course here and conclude, as did the Court of Appeals, that the section is open to a construction that obviates deciding whether a congressional prohibition of handbilling on the facts of this case would violate the First Amendment.

The case turns on whether handbilling such as involved here must be held to "threaten, coerce, or restrain any person" to cease doing business with another, within the meaning of § 8(b)(4)(ii)(B). We note first that "induc[ing] or encourag[ing]" employees of the secondary employer to strike is proscribed by § 8(b)(4)(i). But more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints. Those words, we have said, are "nonspecific, indeed vague," and should be interpreted with "caution" and not given a "broad sweep," *Drivers, supra,* at 290; and in applying § 8(b)(1)(A) they were not to be construed to reach peaceful recognitional picketing. Neither is there any necessity to construe such language to reach the handbills involved in this case. There is no suggestion that the leaflets had any coercive effect on customers of the mall. There was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall.

The Board nevertheless found that the handbilling "coerced" mall tenants and explained in a footnote that "[a]p-

pealing to the public not to patronize secondary employers is an attempt to inflict economic harm on the secondary employers by causing them to lose business. As the case law makes clear, such appeals constitute 'economic retaliation' and are therefore a form of coercion." 273 N. L. R. B., at 1432, n. 6.[3] Our decision in *Tree Fruits*, however, makes untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is "coercion" within the meaning of § 8(b)(4)(ii)(B) if it has some economic impact on the neutral. In that case, the union picketed a secondary employer, a retailer, asking the public not to buy a product produced by the primary employer. We held that the impact of this picketing was not coercion within the meaning of § 8(b)(4) even though, if the appeal succeeded, the retailer would lose revenue.[4]

*NLRB* v. *Retail Store Employees*, 447 U. S. 607 (1980) *(Safeco)*, in turn, held that consumer picketing urging a general boycott of a secondary employer aimed at causing him to sever relations with the union's real antagonist was coercive and forbidden by § 8(b)(4). It is urged that *Safeco* rules this

---

[3] The Board cited two of its decisions that had been enforced by the Courts of Appeals as authority for its construction of § 8(b)(4)(ii)(B). The court in *Honolulu Typographical Union No. 37* v. *NLRB*, 131 U. S. App. D. C. 1, 6, 401 F. 2d 952, 957 (1968), enf'g 167 N. L. R. B. 1030 (1967), upheld the Board's determination that the handbilling there violated § 8(b)(4)(ii)(B), but that handbilling was part and parcel of a consumer picketing campaign in which the handbills were distributed at the edge of a line of picketers who were patrolling the entrance to the mall. The absence of picketing in the present case distinguishes it from *Honolulu Typographical*. In *Great Western Broadcasting Corp.* v. *NLRB*, 356 F. 2d 434, 436 (CA9), enf'g 150 N. L. R. B. 467 (1964), cert. denied, 384 U. S. 1002 (1966), the court upheld the Board's determination that the handbilling there fell within the publicity proviso and thus was not unlawful, but it stated in dictum that § 8(b)(4)(ii)(B) covered the union activity. The court provided no analysis in support of the brief sentence and we find it unpersuasive.

[4] The Board points out that *Tree Fruits* indicates urging customer boycotts can be coercion within the meaning of § 8(b)(4). See 377 U. S., at 72. But the Court was there talking about picketing and not mere handbilling.

case because the union sought a general boycott of all tenants in the mall. But "picketing is qualitatively 'different from other modes of communication,'" *Babbitt* v. *Farm Workers*, 442 U. S. 289, 311, n. 17 (1979) (quoting *Hughes* v. *Superior Court*, 339 U. S. 460, 465 (1950)), and *Safeco* noted that the picketing there actually threatened the neutral with ruin or substantial loss. As JUSTICE STEVENS pointed out in his concurrence in *Safeco*, 447 U. S., at 619, picketing is "a mixture of conduct and communication" and the conduct element "often provides the most persuasive deterrent to third persons about to enter a business establishment." Handbills containing the same message, he observed, are "much less effective than labor picketing" because they "depend entirely on the persuasive force of the idea." *Ibid.* Similarly, the Court stated in *Hughes* v. *Superior Court, supra*, at 465:

> "Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication."

In *Tree Fruits*, we could not discern with the "requisite clarity" that Congress intended to proscribe all peaceful consumer picketing at secondary sites. There is even less reason to find in the language of § 8(b)(4)(ii)(B), standing alone, any clear indication that handbilling, without picketing, "coerces" secondary employers. The loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion, and the neutral who reacts is doing no more than what its customers honestly want it to do.

The Board argues that our first *DeBartolo* case goes far to dispose of this case because there we said that the only nonpicketing publicity "exempted from the prohibition is publicity intended to inform the public that the primary employ-

er's product is 'distributed by' the secondary employer." 463
U. S., at 155. We also indicated that if the handbilling were
protected by the proviso, the distribution requirement would
be without substantial practical effect. *Id.*, at 157. But we
obviously did not there conclude or indicate that the handbills
were covered by § 8(b)(4)(ii)(B), for we remanded the case on
this very issue. *Id.*, at 157–158.[5]

It is nevertheless argued that the second proviso to
§ 8(b)(4) makes clear that that section, as amended in 1959,
was intended to proscribe nonpicketing appeals such as hand-

---

[5] The Board's reliance on pre-1959 cases interpreting the phrase "re-
strain or coerce" in § 8(b)(1)—and similar wording in § 8(a)(1)—to support
its interpretation of the phrase "threaten, coerce, or restrain" in § 8(b)
(4)(ii)(B) is misplaced. The Board had interpreted "restrain or coerce" to
prohibit peaceful picketing calling attention to a labor dispute, but this
Court held in *NLRB* v. *Drivers*, 362 U. S. 274, 290 (1960), that those
words, as used in § 8(b)(1)(A), reached only violent conduct and did not
even include peaceful picketing. See *supra*, at 577. Furthermore, the
Court of Appeals for the Ninth Circuit had rejected the Board's holding
that the circulation of "We Do Not Patronize" lists was coercive. *NLRB*
v. *International Assn. of Machinists*, 263 F. 2d 796 (1959), cert. denied,
362 U. S. 940 (1960). The Board suggests that *NLRB* v. *United Rubber,
Cork, Linoleum & Plastic Workers*, 269 F. 2d 694, 701 (CA4 1959), rev'd,
362 U. S. 329 (1960), is to the contrary, but the opinion in that case focused
on handbilling combined with picketing; and it was the Ninth Circuit case
that was later referred to on the Senate floor in reference to nonpicketing
appeals. See n. 8, *infra*.

Contrary to the Board's view, the cases finding blacklisting of employees
to be coercive within the meaning of §§ 8(a)(1) and 8(b)(1)(A) are not par-
ticularly helpful here. They do no more than illustrate that the "restrain
or coerce" language of those sections has been construed to reach conduct,
such as blacklisting, that threatens employees' livelihood and is imposed in
retaliation for the exercise of NLRA § 7 rights. Furthermore, when done
by the union, blacklisting urges employers to discriminate against prospec-
tive employees on the basis of union membership, an unlawful practice
under the Act. 29 U. S. C. §§ 157, 158(a)(3). See, *e. g., Pacific Ameri-
can Shipowners Assn.*, 98 N. L. R. B. 582, 586, 639–640 (1952).

Of course, as we have explained in the text, the post-1959 decisions of
the Board construing § 8(b)(4)(ii)(B) to reach nonpicketing publicity do not
foreclose our independent inquiry into the meaning of that section.

billing urging a consumer boycott of a neutral employer. That proviso reads as follows:

> *"Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution."

By its terms, the proviso protects nonpicketing communications directed at customers of a distributor of goods produced by an employer with whom the union has a labor dispute. Because handbilling and other consumer appeals not involving such a distributor are not within the proviso, the argument goes, those appeals must be considered coercive within the meaning of § 8(b)(4)(ii)(B). Otherwise, it is said, the proviso is meaningless, for if handbilling and like communications are never coercive and within the reach of the section, there would have been no need whatsoever for the proviso.

This approach treats the proviso as establishing an exception to a prohibition that would otherwise reach the conduct excepted. But this proviso has a different ring to it. It states that § 8(b)(4) "shall not be construed" to forbid certain described nonpicketing publicity. That language need not be read as an exception. It may indicate only that without the proviso, the particular nonpicketing communication the

proviso protects might have been considered to be coercive, even if other forms of publicity would not be. Section 8(b)(4), with its proviso, may thus be read as not covering nonpicketing publicity, including appeals to customers of a retailer as they approach the store, urging a complete boycott of the retailer because he handles products produced by nonunion shops.[6]

The Board's reading of § 8(b)(4) would make an unfair labor practice out of any kind of publicity or communication to the public urging a consumer boycott of employers other than those the proviso specifically deals with.[7] On the facts of this case, newspaper, radio, and television appeals not to patronize the mall would be prohibited; and it would be an unfair labor practice for unions in their own meetings to urge their members not to shop in the mall. Nor could a union's handbills simply urge not shopping at a department store because it is using a nonunion contractor, although the union could safely ask the store's customers not to buy there because it is selling mattresses not carrying the union label. It is difficult, to say the least, to fathom why Congress would consider appeals urging a boycott of a distributor of a nonunion product to be more deserving of protection than nonpicketing persuasion of customers of other neutral employers such as that involved in this case.

Neither do we find any clear indication in the relevant legislative history that Congress intended § 8(b)(4)(ii)(B) to pro-

---

[6] Consumer picketing against the distributor of a struck manufacturer's product was the paradigm case considered in the debates. 105 Cong. Rec. 17904 (1959), 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1437 (1959) (hereinafter Leg. Hist.) (Sen. Goldwater, discussing Conference agreement); 105 Cong. Rec. 15672–15673, 2 Leg. Hist. 1615 (Rep. Griffin); 105 Cong. Rec. 16591, 2 Leg. Hist. 1708 (analysis prepared by Rep. Thompson and Sen. Kennedy).

[7] At oral argument of this cause, counsel for DeBartolo and the Board admitted that such publicity would be prohibited under the Board's interpretation of the section. Tr. of Oral Arg. 8–9, 37–38, 40 (counsel for DeBartolo); id., at 17–19 (counsel for the Board).

scribe peaceful handbilling, unaccompanied by picketing, urging a consumer boycott of a neutral employer. That section was one of several amendments to the NLRA enacted in 1959 and aimed at closing what were thought to be loopholes in the protections to which secondary employers were entitled. We recounted the legislative history in *Tree Fruits* and *NLRB* v. *Servette, Inc.*, 377 U. S. 46 (1964), and the Court of Appeals carefully reexamined it in this case and found "no affirmative intention of Congress clearly expressed to prohibit nonpicketing labor publicity." 796 F. 2d, at 1346. For the following reasons, for the most part expressed by the Court of Appeals, we agree with that conclusion.

First, among the concerns of the proponents of the provision barring threats, coercion, or restraints aimed at secondary employers was consumer boycotts of neutral employers carried out by picketing. At no time did they suggest that merely handbilling the customers of the neutral employer was one of the evils at which their proposals were aimed. Had they wanted to bar any and all nonpicketing appeals, through newspapers, radio, television, handbills, or otherwise, the debates and discussions would surely have reflected this intention. Instead, when asked, Congressman Griffin, cosponsor of the bill that passed the House, stated that the bill covered boycotts carried out by picketing neutrals but would not interfere with the constitutional right of free speech. 105 Cong. Rec. 15673, 2 Leg. Hist. 1615.

Second, the only suggestions that the ban against coercing secondary employers would forbid peaceful persuasion of customers by means other than picketing came from the opponents of any proposals to close the perceived loopholes in § 8(b)(4). Among their arguments in both the House and the Senate was that picketing and handbilling a neutral employer to force him to cease dealing in the products of an employer engaged in labor disputes, appeals which were then said to be legal, would be forbidden by the proposal that became § 8(b)(4)(ii)(B). The prohibition, it was said, "reaches not only

picketing but leaflets, radio broadcasts, and newspaper advertisements, thereby interfering with freedom of speech." 105 Cong. Rec. 15540, 2 Leg. Hist. 1576.[8]   The views of opponents of a bill with respect to its meaning, however, are not persuasive:

> "[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents.   In their zeal to defeat a bill, they understandably tend to overstate its reach.   'The fears and doubts of the opposition are no authoritative guide to the construction of legislation.   It is the sponsors that we look to when the meaning of the statutory words is in doubt.'"   *Tree Fruits*, 377 U. S., at 66 (quoting *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 394–395 (1951)).

Without more, the interpretation put on the words "threaten, coerce, or restrain" by those opposed to the amendment hardly settles the matter.

Third, § 8(b)(4)(ii)(B) was one of the amendments agreed upon by a House-Senate Conference on the House's Landrum-Griffin bill and the Senate's Kennedy-Ervin bill.   An analysis of the Conference bill was presented in the House by Representative Griffin and in the Senate by Senator Goldwater. With respect to appeals to consumers, the summary said that

---

[8] This statement was made in an analysis of the Landrum-Griffin bill by Representatives Thompson and Udall, two of its opponents.   Shortly thereafter but prior to agreement on a Conference bill, this analysis on the secondary boycott provision was adopted almost verbatim in a report issued by Representative Thompson and Senator Kennedy, who also opposed the Landrum-Griffin bill.   105 Cong. Rec. 16591, 2 Leg. Hist. 1708.   Other members of the opposition made similar claims, most notably Senator Humphrey, who led the fight against amending § 8(b)(4) and urged that the limit on secondary boycotts proposed by Senator Goldwater would overturn settled law permitting leafletting of secondary businesses.   He referred particularly to a decision of the Court of Appeals for the Ninth Circuit, the *Machinists* case discussed in n. 5, *supra*.   105 Cong. Rec. 6232, 2 Leg. Hist. 1037.

the House provision prohibiting secondary consumer picketing was adopted but "with clarification that other forms of publicity are not prohibited." 105 Cong. Rec. 18706, Leg. Hist. 1454 (Sen. Goldwater); 105 Cong. Rec. 18022, Leg. Hist. 1712 (Rep. Griffin).[9] The clarification referred to was the second proviso to § 8(b)(4). See *supra*, at 581–582. The Court of Appeals held that although the proviso was itself confined to advising the customers of an employer that the latter was distributing a product of another employer with whom the union had a labor dispute, the legislative history did not foreclose understanding the proviso as a clarification of the meaning of § 8(b)(4) rather than an exception to a general ban on consumer publicity. We agree with this view.

In addition to the summary presented by Senator Goldwater and Representative Griffin, Senator Kennedy, the Chairman of the Conference Committee, in presenting the Conference Report on the Senate floor, 105 Cong. Rec. 17898–17899, 2 Leg. Hist. 1431–1432, stated that under the amendments as reported by the Conference Committee, a "union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over

---

[9] That summary describes the limits on secondary boycotts as falling within four categories:

"1. Closes loophole which permitted secondary boycott through coercion applied directly against secondary employer (instead of his employees).

"2. Closes loophole which permitted secondary boycott by inducing employees individually (rather than in concert).

"3. Closes loophole which permitted secondary boycotts involving railroads, municipalities, and governmental agencies because their employees were not 'employees' under definition in the act.

"4. Prohibits secondary customer picketing at retail store which happens to sell product produced by manufacturer with whom union has dispute."

As for the fourth category, the report notes that the Conference agreement "[a]dopts House provision with clarification that other forms of publicity are not prohibited; also clarification that picketing at primary site is not secondary boycott." 105 Cong. Rec. 18706, 18022, 2 Leg. Hist. 1454, 1712.

the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site." And he assured Senator Goldwater that union buy-American campaigns — that is, publicity requesting that consumers not buy foreign-made products, even though there is no ongoing labor dispute with the actual producer — would not be prohibited by the section.

Senator Kennedy included in his statement, however, the following:

> "Under the Landrum-Griffin Bill it would have been impossible for a union to inform the customers of a secondary employer that that employer or store was selling goods which were made under racket conditions or sweatshop conditions, or in a plant where an economic strike was in progress. We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing." 105 Cong. Rec. 17898–17899, 2 Leg. Hist. 1432.

The Board relies on this part of the Senator's exposition as an authoritative interpretation of the words "threaten, coerce, or restrain" and argues that except as saved by the express language of the proviso, informational appeals to customers not to deal with secondary employers are unfair labor practices. The Senator's remarks about the meaning of § 8(b)(4)(ii) echoed his views, and that of others, expressed in opposing and defeating in the Senate any attempts to give more protection to secondary employers from consumer boycotts, whether carried out by picketing or nonpicketing means. See n. 8, *supra*, and accompanying text. And if the proviso added in conference were an exception rather than a clarification, it surely would not follow, as the Senator said, that under the Conference bill, unions would be free to "conduct informational activity short of picketing" and could handbill, advertise in newspapers, and carry out

all publicity short of ambulatory picketing in front of a secondary site. Nor would buy-American appeals be permissible, for they do not fall within the proviso's terms. At the very least, the Kennedy-Goldwater colloquy falls far short of revealing a clear intent that all nonpicketing appeals to customers urging a secondary boycott were unfair practices unless protected by the express words of the proviso. Nor does that exchange together with the other bits of legislative history relied on by the Board rise to that level.

In our view, interpreting § 8(b)(4) as not reaching the handbilling involved in this case is not foreclosed either by the language of the section or its legislative history. That construction makes unnecessary passing on the serious constitutional questions that would be raised by the Board's understanding of the statute. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR and JUSTICE SCALIA concur in the judgment.

JUSTICE KENNEDY took no part in the consideration or decision of this case.