Thomas **SPIEGEL**, Plaintiff–Appellee,

v.

Timothy **RYAN**; **Dept. of Treasury; Office of Thrift Supervision,** Defendants–Appellants.

No. 90–55942.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1990.

Decided Oct. 11, 1991.

William K. Black, Office of Thrift Supervision, San Francisco, Cal., for defendants-appellants.

Dennis M. Perluss, Dan Marmalefsky, Hufstedler, Kaus & Ettinger, Los Angeles, Cal., for plaintiff-appellee.

Before NORRIS, HALL and RYMER, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

In 1989 Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989). Among other things, FIRREA created the Office of Thrift Supervision ("OTS") to take over many of the savings and loan regulatory tasks previously handled by the Federal Home Loan Bank Board, which the statute abolished. Congress also armed the OTS with expanded powers to deal with the crisis that had gripped the nation's savings and loan industry. In this appeal we resolve a dispute over the OTS's statutory authority to issue a temporary cease and desist order requiring a former officer of a savings and loan association to make restitution in the sum of $21 million pending an administrative hearing to determine whether a permanent cease and desist order should issue. We also consider whether the Temporary Order constituted a pre-hearing deprivation of property that violated due process of law.

I

On November 28, 1989, the OTS launched a formal investigation of Columbia Savings and Loan Association ("Columbia")[1] and Thomas Spiegel ("Spiegel"), its former chairman and chief executive officer. On July 5, 1990, the OTS issued a

---

1. Columbia is a state-chartered, publicly-held savings association with its principal place of business in Beverly Hills, California.

"Notice of Charges and Hearing and Notice of Intention to Remove and Prohibit, and to Direct Restitution, and Notice of Assessment of Money Penalty" ("Notice of Charges"). This notice, *inter alia,* alleged that Spiegel misappropriated corporate assets and committed other violations of banking laws, and set September 4, 1990 as the date for the commencement of an administrative hearing to determine whether the OTS should issue a permanent cease and desist order against Columbia and/or Spiegel. On the same day, the OTS issued a "Temporary Order to Cease and Desist" (the "Temporary Order"), which required Spiegel, *inter alia,* to make restitution to Columbia in the amount of approximately $21 million, by no later than 12 o'clock noon the next day, July 6. The Temporary Order provided that this restitution could be accomplished by a cash payment to Columbia, the establishment of an escrow account, or the posting of a letter of credit or bond.

On July 6, Spiegel filed a complaint in the United States District Court for the Central District of California seeking injunctive relief from the Temporary Order. He argued to the district court that 12 U.S.C. § 1818(c)(1) ("(c)(1)"), the statutory provision authorizing the OTS to issue temporary cease and desist orders, does not authorize the OTS to order restitution as a temporary remedy.[2] In making this argument, he relied on the following language in (c)(1):

> [The OTS] may issue a temporary order requiring [a] party to cease and desist from any ... violation or practice [speci-

fied in § 1818(b)(1)] and to take affirmative action to *prevent* such insolvency [of the institution] dissipation [of its assets], [weakening of its] condition or prejudice [to its depositors] pending completion of ... proceedings [pursuant to (b)(1)].

(emphasis added).

Spiegel reads this language in (c)(1) as restricting the OTS's (c)(1) authority to ordering only "preventive" remedies, which he interprets to mean orders designed to prevent future or ongoing harm to the institution. Restitution does not qualify as such a remedy, he contends, because it is a remedy designed to correct past harm. In the alternative, Spiegel argues that, if (c)(1) is interpreted as authorizing the OTS to require restitution in the Temporary Order, the statute authorizes a prehearing deprivation of his property that violates due process.

In response to Spiegel's complaint, the OTS moved for a preliminary injunction enforcing the Temporary Order. The district court denied the OTS's motion and instead permanently enjoined the OTS from enforcing the order. The court agreed with Spiegel that (c)(1) did not authorize the OTS to require restitution in a temporary cease and desist order and held, in the alternative, that if (c)(1) were interpreted to grant that authority, such an order would violate due process.

We respectfully disagree with the district court on both issues. Rather, we agree with the OTS both that (c)(1) authorized it to issue the temporary restitution order and that the order did not deprive Spiegel of due process of law.

---

**2.** The OTS's authority to issue temporary cease and desist orders rests on 12 U.S.C. § 1818(c)(1), which read, at the time the temporary order issued, in relevant part, as follows: Whenever the [OTS] shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the [N]otice of [C]harges ... is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to [permanent cease-and-desist order proceedings], [the OTS] may issue a temporary order requiring the depository institution or such party to cease

and desist from any such violation or practice and to take affirmative action to prevent such insolvency, dissipation, condition, or prejudice pending completion of such proceedings. Such order may include any requirement authorized under subsection (b)(6)(B) of this section. Such order shall become effective upon service upon the depository institution or such institution-affiliated party [such as Spiegel] and, unless set aside, limited, or suspended by a court in proceedings authorized by [12 U.S.C. § 1818(c)(2)], shall remain effective and enforceable pending the completion of the administrative proceedings pursuant to such notice....

## II

■ As the OTS explains, (c)(1) on its face gives it the power to issue temporary cease and desist orders requiring "affirmative action to prevent ... dissipation [of an institution's assets] or prejudice [to its depositors]." As a matter of common sense, the $21 million in restitution required by the Temporary Order, however satisfied, strengthens Columbia's financial condition by preserving Spiegel's assets, and thereby tends to achieve at least two of the statutory goals set forth in (c)(1), namely, the prevention of the dissipation of assets which might belong to Columbia, and the resulting prejudice to Columbia's depositors.

Moreover, the plain language of 12 U.S.C. § 1818(b)(6) ("(b)(6)") supports our conclusion that the OTS has authority to order restitution in a (c)(1) temporary order. Subsection (b)(6) provides that "the authority to issue an order under this subsection [(b)] *and subsection (c)* of this section which requires ... any institution-affiliated party to take affirmative action to *correct* any conditions resulting from any violation ... includes the authority to ...— (A) make restitution...." 12 U.S.C. § 1818(b)(6) (emphasis added). Thus, the plain, unqualified language of (b)(6) expressly authorizes restitution as a remedy under "subsection (c)."

Spiegel argues that, in unqualifiedly referring in (b)(6) to "subsection (c)," Congress did not really mean "subsection (c)," but instead meant "subsection (c)(3)(A)(ii)." [3] Spiegel offers the explanation that Congress intended "subsection (c)" to mean "subsection (c)(3)(A)(ii)" because (b)(6) and (c)(3)(A)(ii) were enacted at the same time as part of FIRREA. Besides contradicting the plain language of both (b)(6) and (c)(1), Spiegel's interpretation renders (b)(6)'s reference to "section (c)" redundant. Under his interpretation, the reference in (b)(6) to subsection (c) would be meaningless, because subsection (c)(3)(A)(ii) itself explicitly authorizes the OTS to issue temporary orders restoring an institution's books and records. *See United States v. Fields,* 783 F.2d 1382, 1384 (9th Cir.1986) (statutes should be interpreted to give full meaning to all provisions); *see also* 2A *Sutherland Statutory Construction* § 46.06 (4th ed. 1984) (same).

Spiegel also attempts to evade the plain meaning of the language in (c)(1) and (b)(6) by arguing that the use of the word "prevent" in (c)(1) makes restitution unavailable as a remedy because restitution is a remedy that *corrects* past wrongs, not a remedy that *prevents* new ones. This argument overlooks the OTS's compelling point that restitution may not only compensate an institution for past wrongs, but may also serve to prevent the dissipation of assets that may belong to it, and thereby prevent prejudice to its depositors.

As a corollary of his argument, Spiegel cites the fact that (b)(6) conversely uses the word "correct" instead of "prevent" in referring to restitution as a remedy. In our view, the contrast between the use of the word "correct" in (b)(6) and "prevent" in (c)(1), especially when considered in the context of (b)(6)'s plain language authorizing restitution for orders issued under subsection (c), lends no support to Spiegel's argument that we should disregard that plain language and read it as denying the OTS authority to require restitution in temporary orders.

Spiegel's attempt to interpret (b)(6) as *restricting* the OTS's powers under (c)(1) becomes even more implausible when we consider that FIRREA, which added (b)(6) to the statute, was enacted to "enhance[ ] the enforcement powers of the [federal] regulators" to deal with insider abuses leading to "the highest number of [financial institution] failures since the great depression" by clarifying and strengthening "the reach of those authorities to administer enforcement orders." H.R.Rep. No. 5094, 101st Cong. 1st Sess., 134 Cong.Rec.

---

**3.** Subsection (c)(3)(A)(ii) authorizes the OTS to issue a temporary order requiring "affirmative action" to restore a financial institution's books or records "to a complete and accurate state" when the institution's books are so incomplete that the federal agency cannot determine its financial condition.

65, 138–40 (1988). Spiegel's interpretation of (b)(6) would constrict the OTS's enforcement powers precisely when Congress was bent on strengthening the powers of federal regulators to deal with the savings and loan crisis.

We agree, then, with the OTS that (c)(1) authorizes temporary orders requiring restitution. We turn, therefore, to Spiegel's argument, accepted by the district court, that the temporary cease and desist order violated due process because it constituted an unwarranted prehearing deprivation of his property.[4]

### III

■ The Temporary Order required that Spiegel make restitution in an amount exceeding $21 million, or else face daily-accruing money penalties. The order gave him the option of paying Columbia cash, establishing an escrow account, or posting a bond or letter of credit, pending the outcome of the administrative proceedings determining whether the OTS would issue a permanent order. The district court held that the Temporary Order violated the due process clause. We disagree.

The district court began its due process analysis by holding that the Temporary Order deprived Spiegel of his property. The next step in the inquiry, assuming a prehearing deprivation occurred, is determining "what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). We assume that the Temporary Order amounts to a prehearing deprivation of property[5] and conduct the due process inquiry.

### A

Spiegel argues that he was entitled to a predeprivation hearing. As a general rule,

it is true that due process requires a hearing before a person may be deprived of her property. *See Fuentes v. Shevin*, 407 U.S. 67, 90, 92 S.Ct. 1983, 1999, 32 L.Ed.2d 556 (1972). "[I]n a few limited situations," however, the Supreme Court has "allowed outright seizure without opportunity for a prior hearing." *Id.* at 90–91, 92 S.Ct. at 1999–2000. We must determine, then, whether this case presents an " 'extraordinary situation[ ]' that justif[ies] postponing notice and opportunity for a hearing." *Id.* at 90, 92 S.Ct. at 1999.

*Fuentes* listed three factors common to all cases in which the Court has upheld prehearing deprivations:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over the monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Id.* at 91, 92 S.Ct. at 2000. We analyze this case to determine whether the three *Fuentes* factors are present here. Our analysis is also guided by *Federal Deposit Insurance Corp. v. Mallen*, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), which teaches that "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 240, 108 S.Ct. at 1787.

---

**4.** Spiegel argues that we should avoid reaching the due process question by adopting his interpretation of the statute. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.")

This well-known principle of judicial restraint is inapplicable here because Spiegel's interpretation of the statute is "plainly contrary to the intent of Congress." *Id.*

**5.** Because we hold that the Temporary Order did not violate due process, even assuming a deprivation occurred, we need not decide whether the district court erred in deciding that the Temporary Order effected a deprivation.

Applying *Mallen,* the district court held that the Temporary Order served an important government interest, which Congress identified as fighting insider abuse of savings institutions in order to maintain the integrity of savings and loan institutions, as well as to protect the public fisc, which, because of deposit insurance, is obligated to make good on most of the deposits in those institutions. *See, e.g.,* H.R.Rep. No. 54(I), 101st Cong. 1st Sess. 307, *reprinted in* 1989 *U.S. Code Cong. & Admin. News* at 86, 103; H.R.Conf.Rep. No. 222, 101st Cong. 1st Sess. 393, *reprinted in* 1989 *U.S. Code Cong. & Admin. News* at 432. We agree with the district court and hold that the Temporary Order satisfies the *Fuentes* "important governmental interest" prong.

We also agree with the district court that Congress, in authorizing temporary restitution orders pending an administrative hearing, acknowledged a need for prompt action against officers and directors formally charged by the OTS with misconduct harmful to a troubled savings institution. In this case, the temporary restitution order was based upon findings by the OTS's examiners that Spiegel caused Columbia to lend $28 million to a personal friend without adequate collateral, resulting in a loss to Columbia of $5 million, and that he caused Columbia to purchase four condominiums, a jet airplane and a collection of 100 guns, all for his personal enjoyment. In addition, he was charged with accepting inflated compensation, including a $2.4 million bonus in 1989. A year later, shortly after his departure as chairman and chief executive officer, Columbia's financial condition had deteriorated to the point that it was insolvent in the amount of $215 million. In light of the gravity of the charges against Spiegel, it was not unreasonable for the OTS to issue the Temporary Order simultaneously with the Notice of Charges in order to avoid the risk that he would dissipate his assets or attempt to put them beyond the government's reach. As a result, we hold that the Temporary Order

also satisfies the *Fuentes* "special need for very prompt action" prong.

We disagree, however, with the district court's decision that the Temporary Order did not provide "substantial assurance that the deprivation is not baseless or unwarranted." *Mallen,* 486 U.S. at 240, 108 S.Ct. at 1787. Rather, we agree with the OTS that "substantial assurance" that the charges were not "baseless or unwarranted" was provided by a combination of factors: the OTS was required to meet specific statutory requirements before issuing the order, the decision to issue the order was made by the head of the agency expert in these matters, and his decision was supported by detailed findings of Spiegel's misconduct following a long investigation by the OTS's examiners, the results of which were submitted to the district court under penalty of perjury.

Spiegel's only response to the OTS's "substantial assurance" argument is his claim that *Mallen* requires an independent institutional check on agency action depriving a person of property without a prior hearing. Because the OTS issued the Temporary Order solely on the basis of its own internal examination of Spiegel's conduct as chairman and chief executive of Columbia, he contends that the order violated due process. We reject this argument because we do not read *Mallen* as requiring an independent verification of agency action to satisfy the "substantial assurance" test.

In *Mallen,* the Court rejected a due process challenge to an order of the Federal Deposit Insurance Corporation suspending a bank officer without a hearing. In finding that the "substantial assurance" test was satisfied on the facts of that case, the Court relied upon the fact that the target of the suspension order was already under indictment for violating banking laws. Although the grand jury's determination that reasonable grounds existed for believing the officer had violated banking laws provided "substantial assurance" that the FDIC's action was not baseless, nothing in *Mallen* suggests that the Court intended to require an independent institutional check in every prehearing deprivation case.[6] In

---

6. Similarly, nothing in *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), or

other words, the fact that the grand jury indictment was sufficient to satisfy the "substantial assurance" test on the facts of *Mallen* does not mean that an independent institutional check is necessary in every case.

Indeed, in articulating the factors shared by cases upholding prehearing deprivations, *Fuentes* made no reference to an external check on the official's action. Rather, *Fuentes* held that a state statute authorizing the issuance of prehearing writs of replevin would be constitutional if the responsible official determined, "under the standards of a narrowly-drawn statute, that [the prehearing seizure] was necessary and justified in the particular instance." 407 U.S. at 91, 92 S.Ct. at 2000. Moreover, in the cases cited by *Fuentes,* prehearing deprivations were upheld without any suggestion of a requirement of an independent check. *See Ewing v. Mytinger & Casselberry,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (upholding government authority to seize misbranded health products); *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (upholding government authority to appoint conservator for savings and loan institutions); *Phillips v. Commissioner,* 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (upholding government authority to collect corporate taxes from shareholders of dissolved corporation); *Stoehr v. Wallace,* 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604 (1921) (upholding government authority to seize enemy property); *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (upholding government authority to seize and destroy infected food).[7] We thus reject Spiegel's argument that the Temporary Order violates due process because it was based solely on the OTS's internal investigation of Spiegel's conduct.

Under *Fuentes,* however, we must consider whether the statutory scheme has sufficiently tight standards to channel the agency's discretion. On this issue, we find

helpful guidance in *Mallen* and *Fahey,* which involved criteria similar to those in 12 U.S.C. § 1818(c)(1). Under the statute that passed muster in *Mallen,* the agency could suspend an indicted banking official "if continued service or participation by the individual may pose a threat to the interests of the bank's depositors or may threaten to impair public confidence in the bank...." 12 U.S.C. § 1818(g)(1) (Supp.V 1981), *quoted in Mallen,* 486 U.S. at 234 n. 5, 108 S.Ct. at 1784 n. 5. The Rules and Regulations for the Federal Savings and Loan System at issue in *Fahey* provided for appointment of a conservator whenever the Federal Home Loan Bank Administration believed a savings and loan association was "conducting its business in an unlawful or unsafe manner," was "in an unsound or unsafe condition," could not "with safety continue in business" or was "pursuing a course that is jeopardizing or injurious to the interests of its members, creditors or the public," among other things. 24 C.F.R. Cum.Supp. § 206.1 et seq., as amended, 24 C.F.R. 1943 Supp. § 206.1, *quoted in Fahey,* 332 U.S. at 250–53 n. 1, 67 S.Ct. at 1554 n. 1. These statutory standards are not materially different from those guiding the OTS in determining that a party it believes has engaged in an unsafe or unsound practice "is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, ... weaken the condition of the depository institution or otherwise prejudice the interests of its depositors," as it must before issuing a temporary order. *See* 12 U.S.C. § 1818(b)(1) & (c)(1). Given the industry involved, and the degree of regulation that exists in that industry, the standards in (c)(1) are not constitutionally impermissible. *See Fahey,* 332 U.S. at 250–254, 67 S.Ct. at 1554–56; *cf. Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 299–303, 101 S.Ct. 2352, 2372–74, 69 L.Ed.2d 1 (1981) (reasoning that statutory and regulatory criteria are specific

---

*Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), both cited by Spiegel, suggests that an independent check is required.

**7.** These cases are cited in *Fuentes,* 407 U.S. at 92 nn. 24–28, 92 S.Ct. at 2000 nn. 24–28.

enough to insulate immediate mining cessation order from due process challenge).

We, therefore, conclude that the State in this case "has kept strict control over its monopoly of legitimate force," *Fuentes*, 407 U.S. at 91, 92 S.Ct. at 2000, and hold that the OTS' prehearing deprivation of property does not violate due process under *Fuentes.*

## B

 Having concluded that due process does not entitle Spiegel to a predeprivation hearing, we must still determine whether the statute provides due process. Since the statute here mandates a full postdeprivation hearing subject to judicial review, the sole question is whether, under *Mallen*, the postdeprivation hearing is "sufficiently prompt." *Mallen*, 486 U.S. at 241, 108 S.Ct. at 1788. Spiegel does not dispute the promptness of the postdeprivation hearing. Even if he had advanced that argument, however, his contention would have failed. The statute provides for a prompt administrative hearing, no later than sixty days from the notice of charges and temporary order. *See* 12 U.S.C. § 1818(b)(1). Section 1818(c)(2) further provides the party who has been served with the opportunity to seek, within ten days of the temporary order's issuance, an injunction "setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order." 12 U.S.C. § 1818(c)(2).[8] The statute we upheld in *Mallen* did not even provide for such an opportunity for judicial review prior to the administrative hearing. It merely required an administrative hearing within thirty days of a written request and a written decision within sixty days of the hearing. We therefore hold that, under *Mallen*, the statute affords Spiegel adequate process. *Morrissey*, 408 U.S. at 481, 92 S.Ct. at 2600.

## IV

In light of the foregoing, we hold that the issuance of a Temporary Order did not violate due process. Accordingly, the judgment of the district court permanently enjoining the Temporary Order is REVERSED, and the case is REMANDED to the district court to decide whether Spiegel is entitled to subsection (c)(2) injunctive relief on the merits or whether the OTS is entitled to an order enforcing its Temporary Order.

RYMER, Circuit Judge, with whom CYNTHIA HOLCOMB HALL, Circuit Judge, joins, concurring:

I concur, but write separately to express my view that the statutory scheme provides adequate opportunity for judicial review, such that we have no need to say that an independent or judicial screen in the circumstances of this case is unnecessary.

When issued, the temporary order is only "effective," 12 U.S.C. § 1818(c)(1)—it is not "enforceable" until ten days later when the government is entitled to an enforcement order unless the temporary order in the meantime has been set aside, limited, or suspended by a court. 12 U.S.C. § (c)(1); (c)(2); (d). The fact that the temporary order is "effective" immediately upon issuance triggers the respondent's obligations and the statutory time limits for judicial review. Before the order becomes "enforceable" at the end of the ten-day period, the respondent has the opportunity to go in for a full judicial review of the appropriateness of the order. If the respondent fails to do this, then the court must enforce the temporary order at the government's request, without substantive judicial review. This does not deprive a respondent such as Spiegel of due process, because he has the opportunity during the ten-day window to go into court to set

---

8. Spiegel argues that safeguards are inadequate because when the government goes to court to enforce its order, the statute contains mandatory language: the district court "shall" issue an injunction enforcing the order if the court determines that there has been a "violation or threatened violation of failure to obey" the order, regardless of the order's actual content. *See* 12 § 1818(d). We believe that Spiegel's reading of the statute is too rigid. We decline to interpret the statutory language as precluding any judicial review of the agency action at enforcement proceedings.

aside, limit, or suspend enforcement or effectiveness of the temporary order, and to full judicial review in the course of that proceeding.